GABRIELLE H. MILLS, as Administratrix, etc., of FREDERICK L. MILLS, Deceased, Respondent, v. THE SOCIETY OF THE NEW YORK HOSPITAL, Appellant.

Second Department, September 28, 1934.

*John W. Davis* [*Wilson M. Powell* with him on the brief], for the appellant.

*Alfred M. Bailey* [*William T. Gallagher* with him on the brief], for the respondent.

SCUDDER, J. Plaintiff sues to recover damages for the alleged wrongful death of her intestate, Frederick L. Mills, who was killed

on January 9, 1929, while a paying patient at Bloomingdale Hospital for Mental Diseases, a subsidiary of The Society of the New York Hospital.

The complaint pleads two causes of action — one in contract and one in tort. Answering, the defendant denied the existence of any contract, or the breach thereof, and denied that negligence on its part caused Mills' death.

As a separate defense, defendant alleged that it is and always was a charitable and beneficent corporation and that the deceased was a beneficiary thereof.

The record discloses that deceased, Frederick L. Mills, a patient at one of the appellant's hospitals, committed suicide while on a walk outside of the hospital grounds.

The jury, in answer to special questions submitted to it by the trial court, found that the defendant had contracted that the deceased would be watched over, cared for and observed closely at all times, but that there had been no breach of this contract on the part of the defendant in allowing Frederick L. Mills to be taken off the hospital grounds.

The jury also found that the defendant had been guilty of negligence in sending the deceased, in company with four other patients, and in charge of but one physical aide, for a walk upon the public highway, and that such negligence on the part of the defendant was the proximate cause of his death. The amount of the pecuniary loss sustained by the next of kin of the deceased by reason of his death was found by the jury to be $15,000.

Upon the coming in of these special findings of the jury, the learned trial court directed a verdict in favor of the plaintiff upon the tort cause of action, and dismissed the cause in contract.

Defendant moved to set aside the verdict and for a new trial, which motion was denied by the learned trial court, its written memorandum indicating that it reached the conclusion that a distinction existed and had to be drawn between those acts of a superintendent of a hospital which were medical and those which were administrative; and, recognizing that the question as to the kind of treatment to be accorded the deceased, viz., whether he should or should not be sent off the grounds on walking trips, was a medical question, concluded that the extent of the care to be exercised in guarding the deceased while on such walking trips was an administrative act, for which if negligently performed a hospital must answer in damages.

It is the contention of appellant that: (1) A charitable corporation is not liable for injuries sustained by a beneficiary of its charity unless the board of management was at fault. (2) Even if there

is a distinction between medical and administrative acts in point of liability, the sending of Mills on the walk was a medical act for which the appellant is not responsible. (3) The jury's finding of negligence was contrary to the law and against the clear weight of the evidence.

The respondent contends that the act of Dr. Raynor, the superintendent of the hospital, in sending the deceased, in company with four other patients also mentally diseased, upon the public highway on a walking trip under the care of but one physical aide or attendant, was an administrative and negligent act which was the proximate cause of the death of the deceased.

A proper determination of the questions of law presented on this appeal makes necessary a brief review of the facts. The defendant, appellant, will be referred to as the " hospital."

It appears that in October, 1928, the family of Frederick L. Mills observed certain peculiarities about him which invited close supervision over him.

On October 12, 1928, Mr. Mills was taken to Bloomingdale Hospital by his son, to which he was admitted as a patient upon the signing of an agreement to pay monthly in advance for his care at the rate of sixty-five dollars per week. There were other expenses to be met. At the time Mr. Mills had, and the hospital knew he had, suicidal tendencies. He was suffering from involutional melancholia.

Doctor Gregory, one of defendant's experts, testified that a person who had involutional melancholia would have suicidal tendencies, even to the last moment before he recovered; and Doctor Raynor, the medical director of the appellant, testified: " We looked upon his depression as a tendency toward suicide." Doctor Raynor expressed the opinion that Mr. Mills would probably recover, and testified that he did improve while he was an inmate of the hospital.

When admitted to the hospital, Mr. Mills was given a private room in the treatment hall and was kept under the close observation of a special nurse. Thereafter he shared a nurse with some other patients. Later, special observation was withdrawn and he was put on ordinary hall supervision, treatment and care. The record discloses that during the entire time that Mr. Mills was a patient in the hospital he was under the supervision of Doctors Raynor, Hamilton and Sprague, and of the entire medical staff in the men's department.

It appears that in early January, 1929, the hospital doctors considered Mr. Mills' condition to be greatly improved, and decided he would be helped by being placed in a more active group of

patients. On the basis of this improvement, the record discloses that the doctors were of opinion that Mr. Mills no longer had any suicidal tendencies, and on January 7, 1929, transferred him from treatment hall 4 to convalescent hall, known as hall 2, where patients were convalescents and were given greater freedom. Doctor Raynor's instructions were " that all patients who were transferred to hall 2 should be in such mental and physical condition that they could go to occupational therapy twice a day, that they could go walking about the hospital grounds in the morning, and in the afternoon that they should be taken on a walk off from the hospital grounds, and all of this being for the purpose of treatment." It is in evidence that his instructions with respect to hall 2 were " that rounds should be made by the physician and the supervisor daily, in the morning, and other times during the day, and that if any patient, either because of his mental condition or his physical condition, should not go to any one of these activities, that the physician should order that he remain on the hall." The record discloses that this schedule of treatment could be interrupted by the physician in charge at any time when other special treatments might be desirable, and that it was left to the discretion of the doctor in charge of hall 2 whether or not a patient in that hall should be allowed to leave the grounds of the hospital.

The record discloses that the walks which the patients in hall 2 were to take daily were an integral part of the treatment prescribed by the hospital, and that it was a necessary part of the treatment that some portion of these walks should be outside of the hospital grounds.

While in hall 4, Mr. Mills had been allowed to take walks within the hospital grounds, but the purpose of allowing convalescents to go outside the grounds was, as testified to by Doctor Hamilton: " As a man finds that more confidence is reposed in him, that he is going about with other men in whom more confidence is reposed, it often helps him to have a greater sense of security."

It is in proof that Doctor Raynor had ordered that the walks outside the grounds should be conducted by physical aides and that not more than seven persons should be permitted to go with any one physical aide.

As to physical aides, the record discloses that they are not orderlies or attendants; their duties are to take patients out for exercise and also to take charge of them in the gymnasium and supervise outdoor recreations. It appears that an aide is put through a three months' probationary period of training at the hospital before becoming permanently employed. During this probationary period, he is

trained to guard against patients being injured accidentally or otherwise. It is in proof that both of the physical aides involved in this case had graduated from their probationary period and had had extensive training before coming to Bloomingdale Hospital.

Coming now to the day of the accident, January 9, 1929: Between six and seven on that morning, William C. Roden, a registered nurse and the teaching supervisor of the entire men's service, made his prescribed rounds of the hospital, seeing and interviewing all of the patients, receiving reports from head nurses and giving such instructions as he had received from physicians. At that time, he observed Mr. Mills while receiving physiotherapy or ultra-violet ray treatment. He greeted Mr. Mills, who answered "quite agreeably. Smiled, in fact."

Doctor George S. Sprague, psychiatrist at the hospital, saw Mr. Mills that morning about eight o'clock, when making his morning rounds. He testified that Mills "was in a condition such as I had seen him for many days previously, so that I made the mental note to myself that he was in his usual condition. He was not particularly disturbed or depressed; he seemed to be in his, in the improved state that he had been showing for some little while." Doctor Sprague testified that everyone in hall 2 was taken out on walks unless he gave directions to the contrary.

Between twelve-thirty and one-thirty P. M. the same day, Mr. Roden saw Mills at lunch and noticed that he was "eating his luncheon." He gave no orders that Mills should not go on the walk that day. Mr. Roden's duties in respect to the patients in hall 2 were to observe them and receive reports of their physical and mental condition from the charge nurse, but the decision as to which patients should and which should not go out was referred to the physician in charge.

Shortly after lunch, two physical aides, McLaren and Reed, in accordance with standing instructions, took the patients in hall 2 for the prescribed walk. Reed took six patients and McLaren took Mr. Mills and four others. It appears that, outside of the grounds, McLaren joined Reed, and the two groups went along Heatherbloom road in White Plains as one group.

We have in evidence two photographs which show approximately the point where the accident occurred. They do not impress as showing a location with conditions to be avoided in the treatment of patients such as Mills.

The driver of the bus under the wheel of which Mills met his death testified that Heatherbloom road was a macadam road. He would not say there was a great deal or a little traffic on the road; it was a medium traveled road, used by the people who lived

throughout Gedney Farms and for deliveries of supplies; that there were always cars on the road. The positions of the several individuals forming the two groups at the moment of the accident are not made very clear. Some, it seems, were crossing the road just before the accident.

It is in evidence that the bus which figured in the accident stopped fifty to sixty yards from the patients, then started up, and that Mills, getting down on his hands and knees, pushed his head under the front wheel of the bus; that, at the time, physical aide McLaren was walking ahead of the line and physical aide Reed was fetching up behind. According to McLaren's testimony, after the two groups of patients joined, he, McLaren, went at the head of the group, and Reed followed behind. He testified that he noticed a bus stop and then start up; that he turned to see if the patients were clear of the road; that the bus had just passed him when he heard a cry and saw what had happened to Mills.

The testimony of Thomas Rainbow, the bus driver, is to the effect that Mills was at the head of the group, which was walking along stragglingly; that all had crossed the road in front of his bus; that the man nearest to Mills when the latter got down on his hands and knees was about ten to fifteen feet away, and that Mills at the time was about fifteen feet in front of the bus, which was traveling at about eight miles per hour. Asked whether he saw any other man go near deceased or take hold of him, he answered: " Yes, sir. He didn't take a hold of him. There was a man there that was with the other group of men ran towards him and made a grab for him but was unable to catch him."

Respondent argues that had there been sufficient attendants in charge of the group, so that the deceased could have received the personal attention of an attendant, deceased's death would not have occurred, and that the jury rightfully so found by its verdict.

The responsibility for sending Mr. Mills off the hospital grounds in a party of four other patients with but one physical aide to guard and protect them, was assumed by Doctor Mortimer W. Raynor.

As to Doctor Raynor, the respondent accords him a dual personality, and would separate his duties and functions as a medical director of the hospital from his duties and functions as the superintendent of the hospital.

Doctor Raynor testified that he was the medical director of the hospital, and had been such since September 1, 1926; that his specialty was psychiatry, the treatment of nervous and mental diseases, and that he was a duly licensed physician. His general qualifications are in evidence. He was in general charge of the

hospital, at the head of it, and was responsible to the governors of the society. He testified that he had power to hire and discharge employees, and had charge of other administrative functions which the hospital exercised; that all of the duties which he performed were not of a medical nature.

On this foundation is built the argument that Doctor Raynor's authority with reference to exercising patients, the manner in which it should be done, its supervision, etc., belonged to his ministerial and not to his medical functions, and negligently performed, liability follows.

The evidence does not support the argument, which I find it difficult to follow. I cannot conceive that a hospital of this character could be run with two heads, one administrative and one medical, where the administrative could interfere with the medical treatment of patients.

Respondent contends that the nature and extent of the care to be exercised in guarding the deceased while on a walking trip outside the hospital grounds was an administrative act, and that the findings of the jury that the administrative officer was negligent in sending the deceased, with knowledge of his suicidal tendencies, on the public highway outside the hospital grounds, with four other patients, in charge of but one attendant or physical aide, was a negligent act, and that such negligent act was the proximate cause of the death of the deceased.

Respondent concedes that the defendant, appellant, is legally a charitable corporation; that it exercised due care in the selection of physicians and doctors to treat its patients; concedes that the board of governors of the defendant had no direct and actual notice or knowledge that the deceased was sent outside the hospital grounds, but makes no concession to the effect that the board of governors of the defendant were not negligent, urging that in so far as the Bloomingdale Hospital was concerned the board of governors had conferred upon Doctor Raynor, as superintendent of that institution, all of the administrative powers and functions which the board of governors possessed, and that his negligence in their execution is imputable to appellant.

The law seems to be settled in this State that a charitable corporation is not liable to patients for the negligence of its doctors, nurses and physical aides in the treatment of those patients, even though a patient paid for the care and treatment which was furnished him. (*Schloendorff* v. *New York Hospital*, 211 N. Y. 125; *Matter of Bernstein* v. *Beth Israel Hospital*, 236 id. 268; *Phillips* v. *Buffalo General Hospital*, 239 id. 188; *Hamburger* v. *Cornell University*, 240 id. 328; *Higgons* v. *Pratt Institute*, [C. C. A. 2d Cir.] 45 F. [2d] 698.)

Respondent points to no case in New York State which directly draws a distinction between administrative and medical acts of the kind presented in the record before us.

We do find dicta to the effect that a benevolent institution might be liable for the administrative acts of its employees; thus in *Hamburger* v. *Cornell University* (240 N. Y. 328) it is said (at p. 335): " Through such litigation, the rule is settled in this State, and generally elsewhere, that a hospital, if public or charitable, is not liable for the negligence of its surgeons or physicians in the treatment of its patients (*Schloendorff* v. *Soc. of N. Y. Hosp., supra; Phillips* v. *Buffalo Gen. Hosp.,* 239 N. Y. 188). *The question is still open whether it is liable to patients for the negligence of servants or administrative agents.*"

The principles upon which the immunity of a charitable institution is based are set out in *Schloendorff* v. *New York Hospital* (*supra*). Plaintiff, a paying patient at the defendant hospital, sued for personal injuries resulting from an unauthorized operation. In holding that the defendant was not liable for the torts of doctors or nurses, CARDOZO, J., stated that there were two grounds upon which the exemption was based (pp. 128, 129): " The first is that of implied waiver. It is said that one who accepts the benefit of a charity enters into a relation which exempts one's benefactor from liability for the negligence of his servants in administering the charity. [*Hordern* v. *Salvation Army,* 199 N. Y. 233.] The hospital remains exempt though the patient makes some payment to help defray the cost of board. [*Collins* v. *N. Y. Post Graduate Med. School & Hospital,* 59 App. Div. 63; *Wilson* v. *Brooklyn Homeopathic Hospital,* 97 id. 37; *Cunningham* v. *Sheltering Arms,* 135 id. 178; *McDonald* v. *Mass. Gen. Hospital,* 120 Mass. 432; *Downes* v. *Harper Hospital,* 101 Mich. 555; *Powers* v. *Mass. Homeopathic Hospital,* 109 Fed. Rep. 294.] Such a payment is regarded as a contribution to the income of the hospital to be devoted, like its other funds, to the maintenance of the charity. The second ground of the exemption is the relation subsisting between a hospital and the physicians who serve it. It is said that this relation is not one of master and servant, but that the physician occupies the position, so to speak, of an independent contractor; following a separate calling, liable, of course, for his own wrongs to the patient whom he undertakes to serve, but involving the hospital in no liability if due care has been taken in his selection. On one or the other, and often on both of these grounds, a hospital has been held immune from liability to patients for the malpractice of its physicians. The reasons that have led to the adoption of this rule are, of course, inapplicable where the wrong is committed by a servant of the

hospital and the sufferer is not a patient. It is, therefore, also a settled rule that a hospital is liable to strangers, *i. e.*, to persons other than patients, for the torts of its employees committed within the line of their employment. (*Kellogg* v. *Church Charity Foundation*, 203 N. Y. 191; *Hordern* v. *Salvation Army, supra.*) "

The doctrine of implied waiver was not applicable in that case, since the wrong complained of was trespass on the part of a physician, and not merely negligence. The court found another reason for holding the hospital immune from liability — the doctrine that a physician was an independent contractor for whose acts the hospital was not responsible. The basis of the decision is shown in the following language (p. 130): " The fact that the wrong complained of here is trespass rather than negligence, distinguishes this case from most of the cases that have preceded it. In such circumstances the hospital's exemption from liability can hardly rest upon implied waiver. Relatively to this transaction, the plaintiff was a stranger. She had never consented to become a patient for any purpose other than an examination under ether. She had never waived the right to recover damages for any wrong resulting from this operation, for she had forbidden the operation. In this situation, the true ground for the defendant's exemption from liability is that the relation between a hospital and its physicians is not that of master and servant. The hospital does not undertake to act through them, but merely to procure them to act upon their own responsibility."

It is urged before us by appellant that, in the *Schloendorff* case, the " waiver theory " was not rejected; it was merely decided that the " independent contractor " theory was more suitable to the facts involved, and that the true basis of the decision is that the hospital did not undertake to act through these agents, but merely to procure them to act on their own responsibility. It would seem that that decision was not based entirely on the ground that an eminent surgeon was an independent contractor. This inference may be drawn from the fact that, if such were the ground, it would be immaterial whether the hospital were charitable or conducted for profit. (*Matter of Renouf* v. *N. Y. C. R. R. Co.*, 254 N. Y. 349.)

I am unable to see in what was done for the deceased in the instant case anything other than what the record shows to have been proper medical treatment. If we could think of taking patients out for a walk as something quite impersonal, like the exercising of a horse, the act well might be considered administrative; but, accepting what the record shows, that nervous breakdowns with suicidal tendencies on the part of the victim are due to or bring about a loss of confidence and the courage to face one's problems, and

promote the desire to find the easiest way out, through death, we can understand that the restoration of confidence and courage is the *sine qua non* to recovery and must of necessity entail risks, or leave the case hopeless. The record does not show that restoration of confidence and cure could be brought about if the patient believed himself always under strict supervision. Perhaps nothing would be more depressing to him than a man at his elbow every moment. The record makes it clear to my mind that when a patient afflicted as was deceased is convalescing, little by little more and more responsibility and liberty of action must be accorded him to help him regain confidence in himself. The hospital should not be held a guarantor. If it succeeds, it means life; if it fails, the life remaining is without value. The evidence makes all this clear.

On the part of the doctors there was an error of medical judgment; deceased was not as convalescent as it was thought, and, due to his sad affliction, he succeeded in doing away with himself. No liability should attend his death.

The amended judgment as to the second cause of action and the order in so far as it denies a motion to set aside the verdict should be reversed on the law, with costs, the motion to that extent should be granted, and the complaint dismissed as to the second cause of action, with costs.

LAZANSKY, P. J., YOUNG, HAGARTY and DAVIS, JJ., concur.

Amended judgment as to the second cause of action and order in so far as it denies motion to set aside the verdict reversed on the law, with costs, motion to that extent granted, and complaint dismissed as to the second cause of action, with costs.