Luther W. WHITE, III, Administrator,
c.t.a. of the Estate of Donald E.
Meeks, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 3559.

United States District Court
E. D. Virginia,
Norfolk Division.

July 23, 1965.

George H. Gray, Norfolk, Va., for plaintiff.

R. Granville Patrick, Sp. Asst. U. S. Atty., Richmond, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

In an action under the Federal Tort Claims Act plaintiff seeks damages for the wrongful death of Donald E. Meeks, a mentally incompetent person under treatment at the Veterans Administration Hospital, Salem, Virginia, who, on

the afternoon of October 10, 1959, left the hospital grounds and stood in front of a train resulting in his death.

The case has previously been before the United States Court of Appeals for the Fourth Circuit [1] in reversing the action of the trial court which granted summary judgment for the defendant.[2] Plaintiff contends that the language of the Court of Appeals opinion constitutes a finding of negligence on the part of the defendant. Disagreeing with plaintiff we believe that the opinion represented a mandate to the trial court to investigate the facts more fully, take additional evidence, and thereafter make an independent finding as to whether the hospital or its physicians were guilty of negligent custodial care or substandard professional conduct.[3]

Following remand the parties entered into a stipulation permitting consideration of the testimony and exhibits introduced at the summary judgment hearing on January 30, 1962, but reserving the right to call the same witnesses for further evidence. Thereafter additional discovery was permitted.

At the subsequent ore tenus hearing plaintiff produced the former wife of the decedent and Dr. Heyder, a psychiatrist. Defendant presented Dr. Julian B. Doss, the acting chief of staff at the Veterans Hospital (who had testified at the former hearing), and Dr. Ashbury, a psychiatrist who was, at the time of trial, serving as Superintendent of the Eastern States Hospital, Williamsburg, Virginia, and who had worked at the Veterans Hospital in controversy for approximately eighteen months in 1953–54. Various exhibits were likewise introduced at the later trial.

Many facts stand undisputed. Plaintiff's intestate was admitted to the Veterans Hospital at Salem on April 22, 1959 —this being his fourth hospitalization since July, 1948. On August 10, 1959, he was released for a trial visit to his brother's home, but he again became disturbed and was admitted to Kecoughtan Hospital, Hampton, Virginia, on August 16. On August 25 he stated to a nurse that he was fearful that he would run away and requested that he be permitted to go to a closed ward. The following day, after being placed in a security ward, he said that he felt like killing himself and he was placed in a suicidal status closely observed. On August 27 he was transferred to the Veterans Hospital at Salem. The admitting physician, Dr. Crow, testified that he did not observe any suicidal tendencies at the time, although the patient demonstrated some slowing of his regular activities and spoke of tension in his legs, difficulty in sleeping, and requested medication.

Meeks was given 300 milligrams of thorazine per day.[4] On the morning of August 29 he stated that he had a feeling that he was going to harm himself and

1. White, Admr. v. United States, 4 Cir., 317 F.2d 13.

2. White, Admr. v. United States, E.D.Va., 205 F.Supp. 662.

3. The opinion of the Court of Appeals concludes with these words:
   "Having reached the conclusion that the Government is not exempt in this case either under the charitable immunity doctrine or the discretionary function exemption provisions of the Tort Claims Act, we feel it advisable to remand the case for further consideration upon the merits. The District Court reached its conclusion on the merits based on the pleadings and the oral testimony offered by the Government at the pre-trial hearing on its affirmative defenses. While it is true that the Court offered the plaintiff additional time in which to produce evidence which would contradict the facts testified to by the defendant's doctors, we do not think the case a proper one in its then posture for summary judgment on the issue of negligence. There do exist genuine issues of fact and inferences of mixed law and fact to be drawn from the evidence before the Court. Although the plaintiff may not be in position to contradict the basic historical facts, he may wish to offer additional testimony as to the facts or expert opinion testimony to assist the Court in reaching its judgment."

4. The quantity of thorazine given to mental patients is a relative matter with some patients receiving quantities up to 1000 milligrams each day.

requested that he be anchored to a bed and placed in cuff restraint. On September 5 the nurse recorded that his facial expression denoted depression; that night he slept poorly and several times looked in the ward for his brother. He was in observation status at the time, but on September 10, he was removed from that status and five days later was given full privileges. His activities from September 15 until October 9 were uneventful.

Mental patients at the Veterans Hospital in Salem are classified with respect to their freedom of movement around the buildings and hospital grounds as follows: (1) privileged, (2) partially privileged, (3) locked ward, and (4) locked ward with suicidal or homicidal tendencies under an observation status. More specifically, a privileged patient has free access to the hospital grounds; he lives in an open ward with no locks; he is required to report for meals and final bed check at 9 P.M.; he is checked each morning by the ward physician; he is given as much freedom and privileges as possible and, with special permission, may go to nearby towns; if he does not report for a meal as required, the staff is not particularly concerned as the principal check is made at bedtime. A partially privileged patient is permitted to be on his own for definite hours during the day as specified by the ward physician. A locked ward patient is primarily one who is newly admitted, and is locked in a ward for several weeks until classified by the staff physicians. When a patient is believed to be dangerous to himself or others, he is placed on observation status and is locked in a section of the ward under constant supervision of aides and nurses; he has no privileges whatsoever.

On October 9, 1959, Meeks complained that he was very tense, nervous, restless and was unable to sit still. At 3:30 P.M., after telling a doctor that he was fearful that he was drifting back to his condition which existed when he entered the hospital on August 27, he was given 100 milligrams of thorazine, thereby increasing his daily dosage to 400 milligrams. Again at 8 A.M. on the following day, Meeks complained of nervousness and said that he felt that he was getting to be the way he was when he entered the hospital. At 11:20 A.M. he was given 25 milligrams of thorazine intramuscularly. At 1 P.M. Meeks asked to see the doctor again. The nurse telephoned the doctor and 60 milligrams of sodium luminol was prescribed, but Meeks could not be found and this medication was never received. At 3:30 P.M. Meeks was reported missing from the hospital. At 4:25 P.M. he stood in front of the approaching train on tracks running very near the hospital grounds.

Certain other facts are found in the opinion of the Court of Appeals and will not be repeated. The record shows a history of four prior attempts at suicide. Whether these acts were gestures or real attempts at suicide is a question upon which the experts differ. The first event was when Meeks was seventeen years of age, during his second year of high school, when he jumped off a bridge into the water and was saved by his brother.[5] Later, Meeks entered the Army in January, 1943. On one occasion he took an overdose of aspirin tablets;[6] again, while in the Philippines, he attempted to shoot himself with a gun that did not fire; later, while in Leyte aboard a ship, he jumped overboard and was saved.[7] There is considerable merit to the argument that these so-called suicide attempts were "gestures" and not sincere acts

5. This suicide attempt followed a fight with his teacher in which Meeks lost four teeth. He was in love at the time and he felt that his chances with his girl were lost. However, the girl came to see him after he attempted suicide and this impressed him greatly.

6. This suicide attempt was prompted by his desire to get out of the Army.

7. Ibid.

for, as Dr. Ashbury so aptly states, "The only thing I am convinced of is that no one can prevent a determined patient from committing suicide." We all know that every living person is a potential suicide risk. If the person is sufficiently determined, he is bound to succeed. Thus, the circumstances surrounding the four-so-called attempts of many years standing may well justify the conclusion that such acts were gestures.

Meeks was not a new patient at the Veterans Hospital in Salem. At the age of 25 he entered the hospital because "he had been ordered in by the Regional Office" as a World War II veteran. This admission was on July 18, 1948, but Meeks left on July 24 in the custody of his wife and contrary to medical advice. Since his departure was prior to the completion of examinations and studies, it was not possible to make a diagnosis although he was considered competent at the time. It was noted, however, that Meeks had been discharged from the military service with the diagnosis of psychosis, manic depressive, in remission, prostatitis, chronic, and dermatitis, chronic. His complaints just prior to hospitalization on July 18 were headaches, irritability, depression, anti-social tendencies, nervousness, loss of weight and aversion to crowds and company.

The first complete report from the same hospital was the result of an admission on July 11, 1951. The diagnosis was "schizophrenic reaction, unclassified, chronic, severe, manifested by paranoid and perhaps hebephrenic features, auditory hallucinations, ideas of reference, delusions of grandeur (history of) and inappropriate affect, at times, but with emotional lability." The prognosis was guarded and he was deemed incompetent. He was discharged from elopement status on October 9, 1951.[8] He did not appear to be suicidal or homicidal at that time.

Meeks was readmitted at his own request on January 28, 1952. On this visit he was considered quite competent and was given privileges, attended movies and parties, visited the library and learned to play golf. He verbalized very well and psychotherapy was deemed to be the best solution to his problem. It was thought appropriate to discharge him on a trial visit status on February 20, 1952, to be ultimately discharged from trial visit status after 180 days. Thereafter, Meeks secured employment at the Army Base in Norfolk, Virginia; he was interested in his work and it offered a chance for future advancement. He requested a premature discharge from trial visit status which was granted on June 2, 1952.

From that time until early 1959 Meeks did reasonably well. He resigned his position with the Hampton Roads Army Terminal on February 14, 1959. He was very suspicious of his wife's activities and was obviously disturbed when again admitted to the hospital on April 22, 1959. His diagnosis was schizophrenic reaction, paranoid type. On admission he was hostile, hyperactive, profane and paranoid. He was given moderate quantities of thorazine and there was marked improvement within a period of six weeks, at which time he had developed some insight, realized that he was ill and had become calm, quiet, friendly, and cooperative. He adjusted well on privilege status and decided to return to his mother as his wife had filed an action for a divorce. He was granted a 90-day trial visit status and left with his brother, Arthur Meeks, on August 10, 1959, although he was still considered as incompetent. On the day following his arrival at Norfolk he talked to his wife about their marital status and this apparently upset him considerably. Five days later he entered Kecoughtan Hospital as related above.

The Veterans Hospital at Salem—frequently referred to as the Roanoke Veterans Hospital—is located on approximately 300 acres of land. It has a bed capacity of 2000 and is generally filled or

8. The principal reason for leaving the hospital was that his wife was pregnant. The baby was born in October, 1951.

nearly filled. Twenty-five doctors attend the patients, some being psychiatrists but the majority being classified as general practitioners. Wards of about 160 patients are under the care of a staff or ward physician. A psychiatrist supervises the work of other doctors, with each psychiatrist having these duties in from three to four wards. There are, in addition, numerous nurses, nurse's aides, and attendants. The medical staff has received training in psychiatric nursing and are also trained, to the extent possible, in observing suicidal tendencies. The ward physician is on duty from Monday through Friday but, on weekends, only one doctor is generally on duty and he is designated as officer of the day. Meeks met his death on a Saturday when only the officer of the day was on duty.

The front of the hospital faces upon a highway and has no fence enclosing the grounds at this point. A fence does surround the balance of the property, including the rear which is bounded by the railroad track in question. Those with full privileges could climb the fence without difficulty. While there are two security guards on duty at all times, their primary function is to maintain a property and fire security watch. Of course, they are required to report any unusual behavior of any patient, but their purpose is not to physically guard the patients.

Routine transfers between wards are an accepted practice. Similarly, changes in classification of one status to another are routine and considered as beneficial to the patient. The policy of the Veterans Administration Hospitals is to allow each psychiatric patient the maximum independence that his condition permits and to administer the hospital so as to allow as normal a life as possible for the patient. This policy is contained in a published document introduced in evidence.

Psychiatry, while making rapid strides over a period of years, has not yet reached the point of being an exact science. In former days mental patients were placed behind bars and left to die as incurable. The more modern approach is to place confidence in the patient by giving him freedom of movement in order to determine what adjustment he will make. The freedom of movement is not limited to the hospital grounds. Trial visits to the homes and families constitute excellent therapy which is necessary if there is any reasonable possibility that the patient will ever again be able to mix with society and become a useful citizen. Such a therapy program entails risks to the patient and to society as a whole, but it involves a balancing of interests which is most important in the psychiatric field.

As to Meeks, while there is a history of four attempted suicides or gestures relating back to World War II days, there was never any suicidal act during any of his periods of hospitalization or, in fact, since the termination of World War II. It is quite true that Meeks complained on October 9–10 that he was drifting back to the condition which existed when he entered the hospital on August 27. The evaluation of such a complaint under all the circumstances of this case was a matter of judgment. It is a rather common occurrence for a mentally ill person to express concern over his condition and request additional medication. The physician to whom the statement was made by Meeks on October 9 was not a psychiatrist but this doctor, after talking with Meeks, did not believe that he was exhibiting any suicidal tendencies and thought that additional thorazine would be sufficient. On the day of his death, Meeks was seen by another physician who was serving as officer of the day. Again, Meeks seemed to be well oriented as to time, place and person; his speech was relevant and there was no element of depression or tendencies toward self-destruction.

In hindsight it is apparent that the evaluation made by the physicians on October 9–10 was erroneous. There is no "crystal ball" or x-ray capable of determining what may be in the mind of a normal person, to say nothing of one who is mentally ill.

Plaintiff's expert, Dr. Heyder, expressed the view that the conduct of the physicians on October 9–10 was less than the standard of practice exercised by competent physicians in general hospitals. While Dr. Heyder is undoubtedly a qualified psychiatrist, he never practiced in a mental hospital. He places much emphasis on the so-called suicidal attempts, the last of which occurred approximately fourteen years prior to his death. He assumes that these attempts were genuine but says nothing with respect to the motivating factors which prompted such efforts and the fact that there were people nearby who could readily save his life. He admits that suicidal tendencies can be faked. Dr. Heyder concedes that a ward physician in charge of 160 patients would not be expected to know the complete history of all patients, and he attributes this condition as a defect in the system occasioned by a shortage of physicians, but admits that he is not qualified to speak on the subject of the number of physicians required as a standard in operating a 2000 bed mental hospital. Moreover, Dr. Heyder states that a physician's day-to-day observation of the patient is the most important factor touching the physician's judgment.[9]

Dr. Ashbury, testifying at the request of the defendant, is the Superintendent of Eastern State Hospital in Williamsburg, Virginia, which is a state mental institution having a bed capacity of slightly less than 2500. He places much emphasis on the fact that the four prior suicide attempts clearly indicate gestures rather than actual attempts. Three of these incidents are documented and lend support to his view. The fourth, involving an attempted suicide with an unloaded gun, is not documented to show the reason or motivation, other than the fact that we know it took place while Meeks was in the Army, which service he did not like and he was attempting to be re-leased. Without expressly agreeing with every statement made by Dr. Ashbury, it must be conceded that his experience in mental hospitals is extensive and, in the final analysis, the determining question resolves itself into a matter of judgment. We have, in this case, a chronically ill man who had been in this hospital on four separate occasions over a period of ten years. His history demonstrated that his illness was characterized by periods of remission and exacerbation. There was no hope of complete recovery; the best that could be expected was another period of remission which had been accomplished in the past by giving the patient full privileges and ultimately releasing him on trial visit status.

We hold that under all the facts and circumstances of this case, based upon the evidence presented, the standard of care exercised by the hospital and its physicians was in accord with the standard followed by qualified physicians and like hospitals in the general community.

The recent case of Murray v. United States, 4 Cir., 329 F.2d 270, lends at least partial support to the conclusion herein reached. A physician, employed by a Veterans Administration Hospital, administered a drug, paraldehyde, inducing a comatose condition in an intoxicated person who had been brought to the hospital. He thereupon arranged for the delivery of the person to another hospital without instructions as to what should be done with the man, even though he recognized the fact that the patient might vomit and strangle. The physician at the hospital to which the man was sent thereafter telephoned the Veterans Administration physician and was informed of the drug administered, as well as the fact that regulations prohibited the admission of the man to the Veterans Hospital while intoxicated. The physician then released the patient to the police and the man strangled at the police sta-

9. Dr. Parks, to whom Meeks complained on October 9, had seen the patient on a day-to-day basis for approximately ten days prior thereto while Meeks was a patient on his ward. The doctor who saw Meeks on October 10 was not acquainted with him but noted from the record the observations of Dr. Parks on October 9.

tion. The District Court entered judgment against the United States under the theory that, having induced the comatose state, the physician was required to continue his oversight of the patient until he regained consciousness or otherwise protested the action of turning the man over to the police, a fact known to the Veterans Administration physician. The Court of Appeals reversed, holding that the sole duty of the Veterans Administration physician was to arrange for a careful and safe delivery of the patient into competent hands.

The Murray case is not precisely in point, but it touches upon the present situation in that it does not make the physician responsible for every movement of the patient and when a mental incompetent is under care at a hospital, it does not preclude reasonable therapy, such as the granting of privileges, in an effort to better the patient's condition.

▅ A physician is not a warrantor or insurer of a cure. His contract is to treat the case with reasonable diligence and skill. He impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine.[10] The practice of medicine—and especially psychiatry—is not an exact science. It is a matter of common knowledge that mental patients, despite the very highest medical skill and attention, will become involved in difficulties even to the extent of taking their own lives.

▅ The duties imposed by law upon the hospital—as contrasted with those imposed upon the physicians—are very much alike. The hospital is not, of course, an insurer of a patient's safety and the ordinary rule is that the hospital owes the duty of exercising such reasonable care for their safety as their known mental and physical condition may require and in a proper case this duty may extend to affording reasonable protection against self-inflicted injury if the patient is unable to look after his own safety. Jefferson Hospital v. Van Lear, 186 Va. 74, 41 S.E.2d 441; Stuart Circle Hospital Corporation v. Curry, 173 Va. 136, 3 S.E. 2d 153, 124 A.L.R. 176; 70 A.L.R.2d 348.

Authorities are to some extent divided on the factual issues arising from the duties imposed in caring for a mental patient. In Public Administrator of New York County v. State, (1955) 286 App.Div. 573, 146 N.Y.S.2d 81, amended 1 A.D.2d 793, 149 N.Y.S.2d 234, a schizophrenic was initially placed under close observation but, after four months, was permitted to go to the dining hall with other patients. He escaped by running past two guards and was thereafter fatally injured. Liability was rejected on the ground that the permission in question was essentially a medical or psychiatric matter to which the physician in charge gave proper attention, and there was no basis for holding that the physician committed more than an honest error of judgment. In the instant case, we feel that the physicians may have committed an error of judgment [11] but we must consider the precise situation confronting the two physicians on October 9–10, 1959, bearing in mind that Meeks had not attempted suicide on three prior visits to the hospital and had attained states of remission or partial remission by affording him the same type of medication and therapy. We believe that these factors outweigh the import of the patient's statements made on October 9–10 and the four incidents described as attempted suicides, the most recent of which occurred fourteen years prior to 1959.

10. Vann v. Harden, 187 Va. 555, 47 S.E.2d 314; Fox v. Mason, 139 Va. 667, 124 S.E. 405; Reed v. Church, 175 Va. 284, 8 S.E.2d 285; Henley v. Mason, 154 Va. 381, 153 S.E. 653.

11. See Bruce v. United States, S.D.Cal., 167 F.Supp. 579, holding that personal opinions of physicians with which others might disagree furnishes no basis for imposing liability for malpractice.

Other cases holding generally to the same effect are Hebel v. Hinsdale Sanitarium & Hospital, (1954) 2 Ill.App.2d 527, 119 N.E.2d 506; Calabria v. State, 176 Misc. 925, 29 N.Y.S.2d 477, aff'd 263 App.Div. 1056, 34 N.Y.S.2d 820, aff'd 289 N.Y. 613, 43 N.E.2d 836. But where the hospital permitted a missing patient to remain at large for twelve hours, with knowledge that decedent was shrewd, cunning and might escape and hurt himself, liability was imposed in Arlington Heights Sanitarium v. Deaderick, (1925, Tex.Civ.App.) 272 S.W. 497.

Situations such as presented here are difficult to determine. In former days mental hospitals were mere asylums or "jails" for the hopeless. They have gradually become curative institutions but to accomplish the commendable approach to such a serious problem it has become necessary to give the patient sufficient freedom of movement to assure self-controlled responsibility. The objective is treatment, not merely incarceration. Such treatment requires the restoration of confidence in the patient. Dr. Parks, to whose ward Meeks had been assigned for approximately ten days and who had interviewed Meeks on three separate occasions, expressed the view that the patient's progress had been satisfactory while on full privileges. Neither Dr. Parks, who saw Meeks on October 9, nor Dr. Crowgey, who talked with him on October 10, thought that he displayed any suicidal tendencies. They were in a better position to exercise judgment in the matter than anyone else.

█ Risks must be taken with mental patients, otherwise the case is left as hopeless. Fahey v. United States, S.D.N.Y., 153 F.Supp. 878, 885; Mills v. Society of New York Hospital, 242 App. Div. 245, 274 N.Y.S. 233; Id., 270 N.Y. 594, 1 N.E.2d 346. To hold with the plaintiff in this case would stress close observation, restriction and restraint, all of which has fallen into disrepute in modern mental hospitals and the reversal of the policy has brought about excellent results. Perr, Suicide Responsibility of Hospital and Psychiatrist, 9 Cleveland-Marshall L.Rev. 427.

Probably the case which is closest in point is Baker v. United States, D.C.Iowa, 226 F.Supp. 129, wherein the admitting psychiatrist at a Veterans Administration Hospital incorrectly diagnosed the suicidal tendencies of a patient who, four days after admission and assignment to an open ward, attempted suicide by jumping into a window well around which there was a three-foot wire fence. Liability was rejected despite a previous diagnosis by patient's prior physician, known to the admitting psychiatrist, indicating "[p]rogressive symptoms of depression past three months. Suicidal content evident, no real response to imipramine medication to date. Symptoms: Depressed, self accusatory, sleep disturbance and periods of confusion. Suicidal content. Diagnosis: Involuntary psychotic reaction." The Baker case demonstrates far more evidence justifying a recovery than in the matter now under consideration. However, as indicated, it resolves itself into a matter of judgment. As the court pointed out:

"Calculated risks of necessity must be taken if the modern and enlightened treatment of the mentally ill is to be pursued intelligently and rationally. Neither the hospital nor the doctor are insurers of the patient's health and safety. They can only be required to use that degree of knowledge, skill, care and attention exercised by others in like circumstances."

Concluding, as we must, that the failure to remove the privileges granted to Meeks constituted, at the most, a mere error of judgment, an order will be entered upon presentation, dismissing the complaint and entering judgment for the defendant.