**Dorothy W. BANNON, Administratrix of the Estate of Russell E. Bannon**

v.

**UNITED STATES of America and William Driver, in his capacity as Administrator of Veterans Affairs.**

**C. A. No. 3714.**

United States District Court
D. Rhode Island.

Dec. 3, 1968.

---

Milton Stanzler, Providence, R. I., for plaintiff.

Edward P. Gallogly, U. S. Atty., and William J. Gearon, Asst. U. S. Atty., District of R. I., Providence, R. I., for defendant.

## OPINION

PETTINE, District Judge.

### ACTION

This is a suit under the Federal Tort Claims Act 28 U.S.C. § 1346(b) brought by the plaintiff as Administratrix of the estate of Russell E. Bannon, Jr. and William Driver in his capacity as Administrator of Veterans Affairs, to recover damages by reason of the negligent conduct of the defendants agents, servants and employees which resulted in the death of Russell E. Bannon, Jr., in Providence, Rhode Island on September 2, 1965.

### THE EVIDENCE

Russell E. Bannon, Jr. was a veteran who had been treated for mental illness since 1954 or thereabouts at the Veteran hospitals in Brockton, Massachusetts and Providence, Rhode Island. At the time of his death, he was under the supervision and care of the Brockton hospital.

Voluminous medical records were offered in evidence together with the medical testimony of various doctors all of

which showed that the subject was a schizophrenic, undifferentiated type with no basic pathology, suffering from a distortion of external reality beyond a point judged normal.

The Brockton VA Hospital, a teaching hospital affiliated with Harvard, Tufts and Boston University medical schools, has two thousand beds and is devoted to the care of psychiatric patients. One doctor is assigned to care for sixty patients, though at the time of the incident in question the doctor in charge of the deceased was caring for two hundred patients due to resignations of other doctors.

The patients are classified as to their freedom of movement, and on September 2, 1965 the deceased was on so-called full privileges. In essence this meant he had full access to the ground facilities. The only limitation on his freedom of movement was the requirement that he report in the morning to a therapy class in ceramics and be present for a bed check at 9:30 P.M.

The evidence disclosed that, though attendance was taken in the morning at class, absences were reported by exception. In other words, had he been absent, he would have been reported as such and only then would an entry be made in the permanent record of the nursing section. The class attendance sheets were only kept for ninety days, and in this case the same are not available. Since no entry appears in the nursing section for the day in question the defendant urges this court to conclude he did in fact report. However, at 9:30 P.M. he was discovered missing and steps were taken to notify the police and his family. His whereabouts throughout the day could not be verified.

While on elopement status, the investigation shows he went into a gun shop in Providence, and, after asking for some bullets, stated he wanted to look at a gun. While the clerk went to the rear of the store, the veteran shot himself in the head. He was dead on arrival at a hospital in Providence at 3:45 P.M. September 2, 1965. The shot occurred at approximately 3:25 P.M.

The trial testimony developed a series of incidents over the years of repeated utterances by the deceased that he had thought of taking his own life, suicidal threats, assaultive behavior, drinking episodes while on elopement from the hospital grounds, purchase of guns and the carrying of knives. This evidence was established through the hospital records and the testimony of Mrs. Bannon. It must be noted that a number of her experiences with the deceased, though relayed to the hospital authorities, were not recorded.

A petition dated August 4, 1965 was filed in the Providence Probate Court on August 10, 1965 seeking the appointment of a guardian for the deceased. Likewise filed in said court was an affidavit of David A. Mcgaw, M.D., the Brockton VA doctor in charge of the patient, in support of the petition, alleging the subject to be insane, incompetent, and incapable of taking care of himself and his estate. The VA hospital records reflect and note the fact that said petition was on file and citation was served on Russell E. Bannon, Jr. Said petition for guardianship was never acted upon as the death of Russell E. Bannon occurred on September 2, 1965.

The substance of the government's testimony through its medical witnesses was that the care given was commensurate with other hospitals in the community; that the records were adequately kept; that the veteran did not exhibit suicidal tendencies and the full privilege status was warranted by his condition and for his maximum benefit, and that it could not have been anticipated as likely that Mr. Bannon would take his life.

The court feels there is no need to detail all the medical testimony except that of Dr. Alfred Fireman, a Brown University and Tufts Medical School graduate who was board accredited in psychiatry and the author of a number of papers. He was the sole medical ex-

pert for the plaintiff. He stated there was a causal connection between the state of the hospital records and the patient's death; that in his opinion the records were not up to the standards of the community. In answer to a hypothetical question he stated the following:

"I believe that the comings and goings of this patient were not under proper hospital surveillance considering his tendency to act with a degree of excitability and poor judgment in the face of minor stress. I believe that his—the frequency of visits with his physician were insufficient to, his needs. I believe that the severe home situation was not properly surveyed by ancillary service personnel. I believe that his medications were not specifically to the point. His last days in the hospital were not properly administered. I believe that the circumstances attending to his being confronted with the transfer of guardianship were not given, therefore, due to respect for the inherent stresses in them. I believe that improper delays were attendant to his being discovered as a missing patient and procedures thereto, in terms of locating a missing patient."

He also testified that the care given was not reasonably adequate, and as to whether or not suicide could have been anticipated he said,

"I think, for example, that to have said, 'Keep a close watch on Mr. Bannon because he is suicidal and may very well kill himself in the next 10 days,' *could not have prudently been said,* but I think that what could probably have been said is, 'Keep a close watch on Bannon, he is a fellow who acts with excitability and poor judgment. Some stressful things have happened in his life during these past

few days,' and in terms of his power of training and acting out one could have wanted to protect against those exigencies. Now, you protect against those, you also in a sense protect him against the usual slimmer possibility that *I don't think you prudently could have anticipated that he would take his own life,* but I think in seeing to it that, in a sense it's like, if you keep a kid off the street so that he doesn't break his leg in traffic, you also keep him off the street so that he doesn't, you know, so that he's not killed in the street as well." (Emphasis added)

In conclusion, he stated it was his opinion, on the basis of the record, that there should have been further control over Bannon in granting him full privileges.

### FINDINGS OF FACT

1) The care given to Russell E. Bannon, Jr. was commensurate with other hospitals.

2) The medical records of the hospital as they pertained to Russell .E. Bannon, Jr. were adequately kept.

3) The full privilege status given to the decedent was warranted by his condition and for his maximum benefit.

4) It could not have been anticipated as likely that Russell E. Bannon, Jr. would take his life.

### CONCLUSIONS OF LAW

Presented is the twofold problem of determining the applicable law of liability and damages, as the alleged negligent act of permitting the deceased to elope occurred in Mass., while the. death claimed to have resulted therefrom was in Rhode Island.

The Massachusetts death statute as set forth in the Massachusetts general laws is punitive in nature.[1] It limits

1. "A person who (1) by his negligence causes the death of a person in the exercise of due care, or (2) by wilful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, * * * shall be liable in damages in the sum of not less than five thousand nor more than fifty thousand dollars, to be assessed with reference to the degree of his culpability and distributed as provided in section one." Mass.Gen.Laws, Chapt. 229 Section 2.

liability to $50,000, " * * * to be assessed with reference to the degree of his culpability * * *." In this case it can be applied as to the question of liability since the FTCA does not permit recovery for punitive damages.[2]

 It is well settled that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances," in accordance with the law of the place where the act or omission occurred.[3] "Since there is no common-law action for wrongful death, the lex loci delecti must permit [such action] in order that it may lie in the courts of another state."[4] It must follow, therefor, that the liability law governing the case at bar is that of Massachusetts.

There is a paucity of cases in Massachusetts concerning the measure of care imposed on a hospital in caring for its patients, and more especially as to the issue at bar which relates to the duty of a hospital in caring for mentally ill patients who commit suicide.

The presentation of the defendant's case was on the theory that this has two requirements:

a) the duty of the hospital is to render such care as it knew or in the exercise of reasonable care should have known the patient's condition required and that this *duty* is limited by the rule that no one is required to guard against or take measures to avert that which a reasonably prudent person under the circumstances would not anticipate as likely to happen;

b) such duty is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community.

The plaintiff argues to the contrary, contending that neither anticipation nor comparable care are part of the Massachusetts tort law; the question is simply, " * * * whether the hospital was negligent in its care, supervision and management of the patient and whether such negligence was the proximate cause of the injuries sustained." In support of this position three cases are cited.[5]

They can hardly be accepted as authority for the plaintiff's position. In Mahoney v. Harley Private Hospital, Inc. the decision turned on the question whether or not reasonable care to avoid injury caused by a burn had been exercised by the defendant, who had exclusive control of an infant patient. Foreseeability was not at issue, for the conduct of the patient was not present in the problem before the court.

The same reasoning applies to Callahan v. Longwood Hospital, Inc., for there the issue was whether cross-matching of donated blood with that of the prospective recipient to determine compatibility was an essential preliminary step to transfusion, and whether such failure constituted negligence.

Ferguson v. Dr. McCarty's Rest Home, Inc., however, is more germane to the issue at bar, and, contrary to the plaintiff's contention does involve the issue of *foreseeability*. In this case, an elderly paralytic woman patient suffered burns to her foot on account of an attendant placing her in a bed too close to a hot radiator. At page 735 of 335 Mass., at page 338 of 142 N.E.2d the court stated,

"The defendant through its employee was aware of the fact that not only did the plaintiff have a tendency to

---

2. FTC 28 U.S.C.A. § 1346(b). Note sec. 2674 reading, "The United States shall be liable, respecting the provisions of this title relating to tort claims * * *, but shall not be liable * * * for punitive damages."

3. Note 6, FTCA sec. 2674 supra, cases cited. See also Jackson v. Anthony, 282 Mass. 540, 185 N.E. 389; Trudel v. Gagne, 328 Mass. 464, 104 N.E.2d 489;

Higgins v. Central New England and W. R. Co., 155 Mass. 176, 29 N.E. 534.

4. 25A, C.J.S. Death, § 51b, at page 730.

5. Mahoney v. Harley Private Hospital, Inc., 279 Mass. 96, 180 N.E. 723; Ferguson v. Dr. McCarty's Rest Home, Inc., 335 Mass. 733, 142 N.E.2d 337; Callahan v. Longwood Hospital, Inc., 349 Mass. 761, 208 N.E.2d 247.

move to the right but that she also could 'roll towards the left'. With knowledge that this elderly woman was capable of moving in either direction in bed, despite the fact that her left side was totally paralyzed, the defendant's attendant placed her bed close to a radiator which later in the night became very hot. The jury could reasonably have inferred that during the night the plaintiff while asleep moved toward the left side of the bed and that in doing so her left foot came out from under the bed clothes. Although this was a somewhat unusual occurrence, *we think that a jury might, nevertheless, reasonably have found that the defendant ought to have foreseen and guarded against it.*" (Emphasis added)

This court rejects the plaintiff's argument that the rule in Massachusetts does not seem in any way to consider foreseeability as a limitation on the rule of negligence. In Ellingsgard v. Silver,[6] this was at the heart of the issue and the court suggested that foreseeability of incapacity from a heart attack could be proven under certain conditions.

■ It is this court's opinion that the Massachusetts Supreme Court, if confronted with the question as to the measure of care a hospital must exercise in caring for mentally ill persons relative to suicide, would employ the foreseeability limitation and rationale enunciated in Ellingsgard v. Silver, supra. This would be compatible with the general rule stating,

"On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen"[7]

In the case at bar, the area of negligence must be the full privileges as granted in relation to the diagnosis and behavioral history of the patient which the hospital recorded or should have recorded.

A standard of reasonable conduct must be applied, but it is one which does not require a hospital to recognize the unforeseen consequences following from the foreseen conduct. On the basis of all the evidence this court could infer that it was foreseeable the patient might elope, get drunk, act irrationally and with excitability. But there was no legally sufficient evidence that he did in fact ever attempt to commit suicide or that his previous behavior indicated, in the exercise of reasonable conduct, that the hospital should have anticipated self-destruction.

The plaintiff's own medical expert stated the patient had no suicidal tendencies, nor could it have been anticipated that he would take his own life.[8] The plaintiff now argues in his post-trial brief that the court need not and should not rely on the expert opinions alone; that there is ample evidence in the record from which it can form its own in-

---

6. 352 Mass. 34, 223 N.E.2d 813. See also Beaver v. Costin, 352 Mass. 624, 227 N.E.2d 344.

7. 41 C.J.S. Hospitals § 8c(3). Cf. Baker v. United States, 8 Cir., 343 F.2d 222, 225, " * * * that a hospital in that State is only required to render such care to a patient admitted for treatment therein as it knew, or in the exercise of reasonable care should have known, the patient's condition required; and that such "duty" is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community; (citations omitted) * * * the same requirements are equally applicable to mental hospitals generally * * * that a 'hospital is not an insurer of a patient's safety and is not required to guard against that which a reasonable person under the circumstances would not anticipate.' "; St. Mary's Hospital v. Scanlon, 8 Cir., 71 F.2d 739, 743, " * * * no one is required to guard against * * * that which a reasonably prudent person under the circumstances would not anticipate as likely to happen."; White v. United States, D.C., 244 F.Supp. 127; Eanes v. United States, D.C., 280 F. Supp. 143.

8. Transcript Dr. Alfred Fireman, supra.

dependent conclusion. This the court has done and in doing so considered all the incidents as reported by the wife not placed on the record. Nowhere do we find an actual suicidal attempt or medical evidence disputing that it is quite universal for patients to talk or threaten suicide and that such threats cannot be taken as a prediction of suicidal behavior.

The policy embodied in the Veterans Administration regulations is that patients should be allowed the maximum of freedom warranted by their condition. As so well stated by Chief Judge Hoffman [9]

"Situations such as are presented here are difficult to determine. In former days mental hospitals were mere asylums or 'jails' for the hopeless. They have gradually become curative institutions but to accomplish the commendable approach to such a serious problem it has become necessary to give the patient sufficient freedom of movement to assure self-controlled responsibility. The objective is treatment, not merely incarceration. Such treatment requires the restoration of confidence in the patient."

In this case, the doctor in charge exercised his judgment in this regard and granted Mr. Bannon full privilege status. No evidence was introduced by the plaintiff that this was improper. On the contrary, the plaintiff's expert quite agreed with such a status. He merely quarreled with the records, contending that they were so inadequately kept he had to say reasonable care dictated further control should have been exercised in granting such full privileges. However, the inadequacy of such records was disputed by Dr. John E. Snell, Director of the Walter Barton Mental Health Center, Boston State Hospital and Assistant Clinical Professor of Psychiatry at Tufts University School of Medicine. It is significant to note that Dr. Snell also tes-

tified there was no evidence that the treatment given wasn't perfectly adequate and even considering all the incidents testified to by Mrs. Bannon omitted from the record as presented to him by plaintiff's counsel in cross examination, it did not change his opinion; he did not consider it necessary to record all such incidents. He further testified he would not have exercised closer supervision.

■ However, even accepting Dr. Fireman's conclusion, it isn't sufficient for the plaintiff for it leaves unsatisfied the limitation of the required hospital duty founded in anticipation.

In fashioning a rule of negligence, logic and common sense must come into play. Each case presents its own unique problem, and in instances such as presented in the case at bar, a hospital should not be required to guard against that which cannot be anticipated as likely to happen. It is firmly established that a mental patient may well take his own life in spite of the medical care afforded to him. It is, indeed, the most perplexing prediction in a psychiatrist's entire clinical practice.[10] Without this it cannot be said the hospital is responsible. It is part and parcel of the issue which determines whether or not the defendant failed to exercise that degree of care commensurate with the danger involved. Reasoning otherwise is to attempt splitting the question of negligence; on the facts of this case, causation and proximate cause however sensible a limitation it may be on responsibility, does not answer the question.

At the conclusion of the plaintiff's case the defendant made a motion to dismiss the complaint pursuant to rule 41(b) Fed.R.Civ.P. The court, as the trier of the facts, declined to render any judgment until the close of all the evidence.

At the close of the case, the defendant renewed its motion.

In weighing all the evidence and drawing inferences therefrom, this court

9. White v. United States, D.C., 244 F. Supp. 127, 134.

10. Testimony Dr. Alfred Fireman.

finds that the plaintiff has not made out a case by a preponderance of such evidence for the reasons hereinbefore stated.[11]

The plaintiff's complaint is hereby dismissed.

---

11. United States v. United States Gypsum Co., D.C., 67 F.Supp. 397; Palmentere v. Campbell, 8 Cir., 344 F.2d 234; Cf. Island Service Co. v. Perez, 9 Cir., 309 F.2d 799; Allred v. Sasser, 7 Cir., 170 F.2d 233.