Mrs. Kenneth BAKER, as Legal Guardian of Kenneth Baker, and Mrs. Kenneth Baker, Individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. 2–546.

United States District Court
S. D. Iowa,
Davenport Division.

Feb. 13, 1964.

**130**

D. C. Nolan, J. T. Nolan, Iowa City, Iowa, and E. A. Hicklin, Wapello, Iowa, for plaintiff.

Donald A. Wine, U. S. Atty., and Leo Gross, Asst. U. S. Atty., for defendant.

STEPHENSON, Chief Judge.

This action was brought by Mrs. Kenneth Baker as legal guardian for Kenneth Baker, an incompetent, against the United States of America under the provisions of the Federal Tort Claims Act, Title 28 U.S.C.A., § 1346(b) and §§ 2671–2680. Plaintiff seeks to recover damages in the sum of $100,000 for injuries allegedly sustained by her ward in attempting to commit suicide by jumping into a concrete window well on the grounds of the Veterans Administration Hospital at Iowa City, Iowa, where said ward was under psychiatric treatment. In addition plaintiff, individually, seeks damages in the sum of $25,000 for loss of consortium. Plaintiff charges the V. A. Hospital staff

with specific acts of negligence in failing to: (1) maintain sufficient physical restriction over said patient; (2) maintain proper supervision over said patient; (3) exercise ordinary and due care for said patient in his existing mental and physical condition; (4) properly diagnose the patient's illness and mental condition and to reasonably determine that he was in such condition that he might be reasonably expected to commit suicide if not properly supervised and restrained; (5) heed the information and warning from the patient's attending physician and family regarding his condition; and in (6) maintaining a deep pit or window well uncovered in close proximity to the area provided for mental patients and freely accessible to them. Plaintiff also charges negligence under the doctrine of res ipsa loquitur. The government denied its hospital staff or employees were negligent as charged.

Counsel for both parties presented this matter vigorously and furnished the Court with excellent briefs.

■ This cause was tried to the Court sitting without a jury as provided by Title 28 U.S.C.A. § 2402. The injury having occurred in Iowa the law of this State controls, Title 28 U.S.C.A. §§ 1346(b), 2674; Massachusetts Bonding & Ins. Co. v. United States, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956). The State law controls: as to liability for negligence, Fair v. U. S., 234 F.2d 288 (5 Cir. 1956); as to the doctrine of res ipsa loquitur, White v. U. S., 193 F.2d 505 (9 Cir. 1951); as to the doctrine of respondeat superior, William v. U. S., 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955); Callaway v. Garber, 289 F.2d 171 (9 Cir. 1961); as to damages, Massachusetts Bonding & Ins. Co. v. United States, supra; Montellier v. United States, 315 F.2d 180 (2 Cir. 1963).

■■ It is clear that under Iowa law charitable institutions must respond for the negligence of their employees. Haynes v. Presbyterian Hospital Ass'n, 241 Iowa 1269, 45 N.W.2d 151 (1950). Cf. White v. U. S., 317 F.2d 13 (4 Cir.

1963) reversing, 205 F.Supp. 662 (E.D. Va.). In the matter at hand the United States must respond in damages for the negligence, if any, of its staff and employees at the Veterans Hospital. In determining the issue of negligence a review of the facts is necessary.

Plaintiff's ward, Kenneth Baker (hereinafter referred to as the patient) was referred to the Veterans Administration Hospital in Iowa City, Iowa, on August 23, 1960, by his attending physician, Dr. C. E. Schrock, M.D. The patient, then 61 years of age, had been under Dr. Schrock's care for approximately 60 days prior thereto. In a medical certificate accompanying the patient's written application for admission to the V. A. Hospital, Dr. Schrock indicated the following:

Brief History: Progressive symptoms of depression past three months. Suicidal content evident, no real response to imipramine medication to date.

Symptoms: Depressed, self accusatory, sleep disturbance and periods of confusion. Suicidal content.

Diagnosis: Involuntary psychotic reaction.

The patient's wife testified that at the time of patient's application for admission she conferred with Dr. James A. Kennedy, M.D. (then acting Chief of the Neuropsychiatric Service at the V. A. Hospital) and advised him that there was a suicidal tendency on the part of her husband and told him about finding a gun her husband had hid in one of the buildings on the farm about three weeks before. Dr. Kennedy interviewed the patient for an hour to an hour and a half, visited with the patient's wife and brother, examined the admitting certificate above referred to, and advised the patient's wife that the patient would be admitted provided certain financial data concerning the patient was furnished (the doctor requested this data for the purpose of confirming that the patient's belief as to his state of poverty was in fact a delusion and completely unfounded). This data was furnished the next day and Dr. Kennedy then ordered his admission to Ward 10E, an open ward, because as the doctor testified "in my opinion he did not present himself as a suicidal risk." The patient remained on this open ward on the 10th floor for the next three days and had free access to go to the 3rd floor for meals, to the canteen, and to go outside. On August 27, 1960, the patient left the ward on the 10th floor voluntarily and went to the grounds immediately outside the hospital building. At about 7:30 p. m., the patient jumped into a window well 13 feet deep in an obvious suicide attempt. He suffered scalp wounds, fractures of the left clavicle, the 8th, 9th and 10th ribs, and the left transverse processes of the 3rd, 4th and 5th lumbar vertebral bodies. About six hours later the patient suffered an occlusion of the left carotid artery. Thereafter the patient suffered a complete paralysis of his right side. On April 19, 1961, the patient was removed to Restopia, a private nursing home, where he now remains. The patient is completely and permanently disabled both mentally and physically and requires constant nursing attendance.

In considering the various allegations of negligence it should first be observed that there is no evidence indicating that hospital employees failed to carry out the orders of Dr. Kennedy or any other physicians in the care of the patient. Failure on the part of hospital employees to carry out the instructions of a patient's physician may constitute a violation of the standard of care required of hospitals. Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 107 N.W.2d 85 (1961). Neither is there evidence indicating any appreciable change in the patient's condition from the time of his admission to the time of the suicidal attempt which might require action on the part of hospital employees not covered by Dr. Kennedy's instructions. Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 101 N.W.2d 167 (1960). It should also now be observed that the window well into which the patient leaped

was enclosed by a heavy mesh wire fence which was at least three feet high. This was not a case of the patient falling into the window well but the injury was caused by a deliberate leap of the patient over the fence into the window well.

Although it may have been better practice to cover the window well [1] the Court finds that under the evidence in this case the defendant was not negligent in failing to close the window well with a suitable covering.

The negligence, if any, which was the proximate cause of the patient's injuries arises out of the failure of Dr. Kennedy to properly diagnose the patient as a sufficient suicide risk so as to require closer supervision than was furnished by the immediate assignment of the patient to an open ward. A closed ward on the 9th floor was available to which patients were assigned when close supervision was deemed advisable. The issues are: What standard of care was required of the hospital and its staff? Was that standard of care violated in assigning the patient to an open ward?

■■ There appear to be no Iowa cases involving the standard of care required of mental hospitals toward their patients. But it appears generally, that the care required of a hospital includes giving such care to a patient as the hospital knew or in the exercise of reasonable care should have known was required. This duty is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community. A hospital is not an insurer of a patient's safety and is not required to guard against that which a reasonable person under the circumstances would not anticipate. Shover v. Iowa Lutheran Hospital, supra, 252 Iowa 712, 107 N.W.2d 85; Bradshaw v. Iowa Methodist Hospital, supra, 251 Iowa 384–385, 101 N.W.2d 167; 41 C.J.S. Hospitals § 8c(3), pp. 349–350.

The standard of care required of mental hospitals in other jurisdictions follow these same general standards. Mounds Park Hospital v. Von Eye, 245 F.2d 756, 70 A.L.R.2d 335 (8 Cir. 1957). It is particularly recognized in the treatment of mental patients that diagnosis is not an exact science. Diagnosis with absolute precision and certainty is impossible. Further the objective is treatment not merely incarceration. Treatment requires the restoration of confidence in the patient. This in turn requires that restrictions be kept at a minimum. Risks must be taken or the case left as hopeless. See Fahey v. United States, 153 F.Supp. 878, 885 (S.D.N.Y.1957), reversed on other grounds, 2 Cir., 219 F.2d 445; Mills v. Society of New York Hospital, 242 App.Div. 245, 274 N.Y.S. 233, 270 N.Y. 594, 1 N.E.2d 346 (1936). The standard of care which stresses close observation, restriction and restraint has fallen in disrepute in modern hospitals and this policy is being reversed with excellent results. See, Perr, Suicide Responsibility of Hospital and Psychiatrist, 9 Cleveland-Marshall L.Rev. 427. This trend in the treatment and care of the mentally ill is reflected in regulations promulgated by the Administration of Veterans Affairs pursuant to the authority granted in 38 U.S.C.A. § 621.

"*Treatment and care of the Mentally Ill.* The policy of the V. A. is to allow each psychiatric patient the maximum independence that his condition permits and to administer the hospital so as to allow as normal a life as possible for the patient. All medically accepted therapeutic facilities will be available to each patient as required and if necessary such facilities will be made available by transfer to appropriate hospital." (Reg. M2–10 change t Par. 102).

The difficulty lies in the application of the foregoing policy. Each case must

---

1. The investigating board appointed to investigate the suicide attempt by the patient recommended that a suitable covering be placed over all window wells as an added precaution and this was done.

rest on its specific facts. The assignment of the patient to an open ward by Dr. Kennedy is the critical issue before this Court. Was the doctor negligent? In Wilson v. Corbin, 241 Iowa 593, 599, 41 N.W.2d 702, 705 (1950), the Iowa Supreme Court said:

> "A physician is bound to use that degree of knowledge, skill, care, and attention ordinarily exercised by physicians under like circumstances and in like localities. He does not impliedly guarantee results. Bartholomew v. Butts, supra, 232 Iowa 776, 779, 5 N.W.2d 7, 9, and citations.

> "Of course malpractice may consist in lack of skill or care in diagnosis as well as in treatment. In re Estate of Johnson, 145 Neb. 333, 16 N.W.2d 504, 511, and citation; Kuechler v. Volgmann, 180 Wis. 238, 192 N.W. 1015, 31 A.L.R. 826, 829, and citation; 41 Am.Jur., Physicians and Surgeons, section 92.

> "A patient is entitled to a thorough and careful examination such as his condition and attending circumstances will permit, with such diligence and methods of diagnosis as are usually approved and practiced by physicians of ordinary learning, judgment and skill in the community or similar localities. A physician does not insure the correctness of his diagnosis. Ramberg v. Morgan, 209 Iowa 474, 477, 218 N.W. 492. See also In re Estate of Johnson, supra, 145 Neb. 333, 16 N.W.2d 504, 510, and citations; Hill v. Boughton, 146 Fla. 505, 1 So.2d 610, 134 A.L.R. 678, 682; 41 Am.Jur., Physicians and Surgeons, section 92.

> "Ordinarily, evidence of the requisite skill and care exercised by a physician must come from experts. Bartholomew v. Butts, supra, and citations. But there are exceptions to this rule. Whetstine v. Moravec, 228 Iowa 352, 370 et seq., 291 N.W. 425 and citations, especially Kopecky v. Hasek Bros., 180 Iowa 45, 49, 162 N.W. 828, 830, also cited with approval in Wambold v. Brock, 236 Iowa 758, 762, 19 N.W.2d 582, 584; Peterson v. Hunt, 197 Wash. 255, 84 P.2d 999, 1000, and citations."

See also, Lagerpusch v. Lindley, 253 Iowa 1033, 115 N.W.2d 207 (1962).

In the case at hand plaintiff offered evidence of practices followed at the State University of Iowa Psychopathic Hospital in the same city and during the same period of time as here involved. In this connection Dr. Paul Huston, Director of that hospital since 1956, testified as follows:

> "A The first step would have been to establish the diagnosis and to determine if in fact this man was depressed, as the note from the referring physician had indicated. Since the referring physician had indicated that there was suicidal content to this man's thinking, we would have paid particular attention to this in order to determine what kind of precautions would be necessary in handling the case.

> "Q And what kind of precautions would be used until it was found definitely he was subject to that suicidal content or was not?

> "A Well, this varies some. It depends upon the presence or absence of the suicidal content. If present, this means certain precautions. If they are absent, then precautions aren't generally taken. If one is unsure, one is apt to be conservative and keep the patient under observation for a few days and try to determine whether there are suicidal thoughts in the patient's mind. Now as to the exact nature of precautions, this means generally that the patient is never let out of somebody's sight, out of sight of an employee of the hospital, a nurse or an attendant. It means that he does not have access to materials which he could readily destroy himself with—knives, razors, belts, and so on. If the suicidal intent is prominent, then

an attendant even accompanies the patient to the bathroom. He isn't left alone, you see. So that it varies, depending upon the degree or judgment of the degree of the suicidal impulse and whether it's present or not.

"Q Doctor, would a patient such as referred to there in Exhibit 1 have been given free access to go and come from his quarters and freedom of the building and grounds at the Psychopathic Hospital during the month of August, 1960?

"A This would be very difficult to determine. The patient, when he arrived at the hospital, may not have been as depressed as was indicated by the referral note from Doctor Schrock. In Doctor Kennedy's report, he made a very definite attempt to determine the depth of the depression. He brought out that there had been history of it and that there were certain signs present now. But this comes, in the end, to a matter of judgment. It's entirely possible to miss a depression or suicidal thought on the first examination. On the other hand, if the referring physician has referred to this, then one is perhaps inclined to be more conservative and take extra precautions. So that, this is an extraordinarily difficult question to answer, you see.

"Q Well, ordinarily, doctor, what would be the practice in a case such as Mr. Baker where there is suicidal content indicated by the referring doctor?

"A We would have taken this very seriously.

"Q And what procedure would have been followed in regard to his care and treatment there at the Psychopathic Hospital during that time?

"A I think we would have been conservative in our approach to it.

"Q And what do you mean by that?

"A Well, I can't say for sure, I didn't see the patient, you see. But we possibly would have written in the note 'suicidal precautions' at least for a few days until we got a chance to know this patient better, and this would have meant that he would have been under observation and that somebody would have watched him closely all the time.

\*  \*  \*  \*  \*  \*

"Q To summarize your testimony then, doctor, in this particular case, such as Mr. Baker, you would have been on the conservative side as I understand your testimony. Is that correct?

"A Yes, I think so. If you are going to err, err on the conservative side, I feel. But again let me emphasize, I wasn't there, I didn't examine the patient. It's impossible to say what I would have done had I seen him, you see."

Dr. H. J. Madsen, Director of the 1540 bed Neuropsychiatric Veterans Hospital at Knoxville, Iowa, expressed the opinion that the patient received perfectly acceptable psychiatric care.

■ In reviewing the conduct of Dr. Kennedy it will be considered that he was aware of Dr. Schrock's note on the medical certificate as to the patient's mental condition prior to admission and the statement made by the patient's wife concerning the finding of a hidden gun, as heretofore related.[2] It will also be considered that the doctor conducted a lengthy interview and examination of the patient and made his own judgment that the circumstances did not require assignment of the patient to a closed ward or that other precautions be taken. Without reviewing all of the facts in detail it is sufficient to state that the Court finds that Dr. Kennedy exercised the proper standard of care required under the circumstances. Calculated risks of

---

2. There was no evidence of an actual attempt by the patient to commit suicide.

necessity must be taken if the modern and enlightened treatment of the mentally ill is to be pursued intelligently and rationally. Neither the hospital nor the doctor are insurers of the patient's health and safety. They can only be required to use that degree of knowledge, skill, care and attention exercised by others in like circumstances.

■ Plaintiff also charged the defendant with negligence under the doctrine of res ipsa loquitur. Whether a complaint states a cause of action calling for the application of the doctrine of res ipsa loquitur is a procedural question controlled by Federal law. Ramsel v. Ring, 173 F.2d 41 (8 Cir. 1949). The complaint is sufficient in this regard. Whether the doctrine is available under the plaintiff's evidence is a question of substantive law controlled by the laws of Iowa. State Mutual Life Assurance Co. v. Wittenberg, 239 F.2d 87 (8 Cir. 1957).

In Lagerpusch v. Lindley, 253 Iowa 1033, 1037, 115 N.W.2d 207, 210 (1962) the Iowa Court said:

"The essential component parts of res ipsa loquitur are: 1. The instrumentalities causing the injury must be under the exclusive control of defendant. 2. The happening of the injury must be such that in the ordinary course of events it would not occur without lack of due care on the part of defendant.

"In the absence of either of the above elements the doctrine does not apply. * * *

"The doctrine of res ipsa loquitur should be used very rarely in medical cases. Shinofield v. Curtis, 245 Iowa 1352, 66 N.W.2d 465, 471, 50 A.L.R. 2d 964; 65 C.J.S., Negligence, § 220 (10); Mogensen v. Hicks, supra [110 N.W.2d 563].

"In many medical cases the doctrine of res ipsa has been rejected: Berg v. Willett, 212 Iowa 1109, 232 N.W. 821; Gebhardt v. McQuillen, supra [230 Iowa 181, 297 N.W. 301]; Lippard v. Johnson, 215 N.C. 384, 1 S.E.2d 889; Prewitt v. Higgins, 231 Ky. 678, 22 S.W.2d 115; Groce v. Myers, 224 N.C. 165, 29 S.E.2d 553; Mogensen v. Hicks, supra."

■ It is the view of the Court that the doctrine of res ipsa loquitur does not apply in the case at bar. In any event, the doctrine permits, but does not compel, an inference that defendant was negligent. The defendant by its evidence has rebutted any such inference of negligence.

■ Although unnecessary in view of the foregoing findings of the Court, a few brief comments will be made in connection with other matters urged by the parties. It is the opinion of the Court that while the policy promulgated by the Veterans Administration Regulation fostering minimum restraint in the care and treatment of patients comes within the discretionary function exemption of 28 U.S.C. § 2680(a) the applicability of that policy to an individual case, as now before the Court, is not within that exemption. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Dahlstrom v. United States, 228 F.2d 819 (8 Cir. 1956); White v. United States, 317 F.2d 13, 16 (4 Cir. 1963); Fair v. United States, 234 F.2d 288 (5 Cir. 1956). If the hospital staff or employees were guilty of negligence in assigning the patient to an open ward and permitting him free access to the outside, the government would be responsible.

■ The issue of whether the patient's leap into the window well and resultant blow to his shoulder area was the proximate cause of the occlusion of the carotid artery some six hours thereafter was in serious dispute. Experts testified for both sides. Plaintiff's witnesses were of the opinion that the blow was the proximate cause of the occlusion. Defendant's witnesses were of the opinion that such was not the case and that the occlusion was due to arteriosclerosis. It is the conclusion of the Court that the weight of the evidence is with the plaintiff on this issue. The Court finds that the trauma suffered by the patient as a

result of the leap into the well was the precipitating cause of the occlusion of the carotid artery.

The foregoing memorandum shall constitute the Court's findings of fact and conclusions of law as provided by Rule 52, Federal Rules of Civil Procedure. Judgment will be entered for the defendant.