[No. 38521.    En Banc.    June 15, 1967.]

LEE ADAMS *et al.*, *Respondents*, v. STATE OF WASHINGTON, *Appellant.**

*Reported in 429 P.2d 109.

*The Attorney General, Dean A. Floyd, Assistant,* and *Earl E. Yates, Special Assistant,* for appellant.

*Erle W. Horswill* and *Kahin, Horswill, Keller, Rohrback, Waldo & Moren,* for respondent.

DONWORTH, J.—This action was brought by Lee Adams and Maude Adams, his wife, against the state of Washington to recover damages resulting from injuries suffered by Maude Adams while she was a voluntary patient at Western State Hospital in Steilacoom. The action was instituted pursuant to RCW 4.92, respondents alleging negligence on the part of appellant state in that it had failed to supervise properly and restrain Mrs. Adams, and had permitted her to leave the hospital, although its employees knew of her mental condition, which involved a substantial desire to injure herself. It was alleged that, as the proximate result of such negligence, Mrs. Adams did leave the hospital and also the hospital grounds on February 18, 1965, and jumped or squatted down in front of an automobile traveling on Steilacoom Boulevard, thereby receiving extensive and permanent injuries, which are discussed in detail later in this opinion.

Appellant state denied negligence; alleged assumption of risk in that Mr. and Mrs. Adams had voluntarily requested admission to the hospital with knowledge of the method of treatment to be followed; and alleged lack of jurisdiction of the court for the reason that the standard of care at the hospital was a discretionary state function and, as such, was absolutely privileged. The issues thus joined were tried before a jury beginning on June 28, 1965.

Prior to the presentation of evidence, respondents' motion to amend their claim by substantially increasing the prayer for damages was granted. Appellant's motion for separation of the issues of liability and damages, and for separate trial on each, was denied.

At the conclusion of respondents' case on rebuttal, each party moved for directed verdict on the issues pertaining to liability. Both of these motions were denied.

On July 2, 1965, the jury returned a verdict for respondents in the sum of $275,000. Appellant's motion for judgment n.o.v. or for a new trial was denied and judgment was entered on the verdict.

As background for the discussion of the issues involved, the following facts are presented.

Mr. and Mrs. Adams were married on June 2, 1947, when Maude was 19 years old. They were unable to have children during the first few years of their marriage, and finally, on October 9, 1957, adopted a little girl, Christine. Christine was suffering at the time from a childhood disease known as "thrush."

Mrs. Adams became unduly nervous about Christine and made several visits to a Portland psychiatrist. Her treatments there appeared to be successful so far as Mr. Adams could tell. Then, on April 12, 1959, a second child arrived, the first born to Mr. and Mrs. Adams.

In March, 1963, while Mrs. Adams was expecting their third child, Mr. Adams was injured while on the job at Weyerhauser Pulp in Longview, where he was employed as a machine tender, and was out of work for about 5 months. During this period, he was away from home attending a vo-

cational training center most of the time. Mrs. Adams apparently became greatly concerned at that time about their financial situation.

Following the birth of their third child, on July 19, 1963, Mrs. Adams became depressed and took an overdose of aspirin. After her hospitalization, she was referred to Dr. Austin, a psychiatrist in Longview, for counseling and treatment. Dr. Austin recommended electro-shock treatment and medication. However, when she failed to respond favorably to these treatments, Dr. Austin urged her voluntary admission to Western State Hospital. She was admitted there on October 4, 1963. The diagnosis was "depressive reaction."

November 8, 1963, Mrs. Adams was released from Western State Hospital, apparently greatly improved. However, late in the month of November, she again became depressed, and Dr. Austin became concerned that she might seriously injure herself. She applied for readmission to Western State Hospital, but was refused. Thereafter, following the assassination of President Kennedy, Mrs. Adams made a second, nearly successful, attempt on her life by taking a large overdose of a tranquilizer. She was readmitted to Western State Hospital in early December, 1963. The diagnosis, as before, was psychoneurotic depressive reaction.

During both periods at Western State Hospital, Mrs. Adams was placed in an open ward in milieu therapy. The purpose of this method of treatment is to place the patient in an environment as nearly like that of home as is possible under hospital conditions. The patients in the open ward are generally permitted to come and go at will with certain minimal restrictions as to time. They are also permitted visits, for varying periods of time, to their homes and families.

On Friday, February 14, 1964, Mrs. Adams was permitted a projected 10-day visit to her home. However, Mr. Adams noticed that she became nervous and distraught, and learned that her medication had been changed.

On Saturday, February 15, 1964, her condition became such that Mr. Adams returned her to the hospital. Twice en route, while he was driving the car, she tried to grab the steering wheel. Upon Mr. and Mrs. Adams' arrival at the hospital, Dr. Pettera was called from his home. During the conversation between Dr. Pettera and Mr. Adams and Mrs. Adams, she smashed a window in Dr. Pettera's office with her hand.

The following day, Mrs. Adams seemed calm, and Mr. Adams was permitted to take her off the grounds for a drive. He returned her to the hospital and then went home.

On Tuesday morning, Mrs. Adams again became highly agitated and, at about 7 a.m., broke another window with her hand. The resulting lacerations required several stitches. Mrs. Adams fought with Dr. Toyama, the resident surgeon on rotation from Virginia Mason Hospital in Seattle, who tried to treat her wounds, and the three attendants who assisted him, and, while in the minor surgery ward, she threw herself off the operating-room table.

Dr. Toyama, after suturing her wounds and placing her hand in a very light cast to protect the stitches, noted on her consultation report:

Prevent further self injury. Patient jumped off table after above suture and hit floor very hard. Seems bent on injuring self.

Dr. Pettera, Mrs. Adams' attending physician at Western State Hospital, was notified, and he ordered that she be sedated, kept on the ward under observation, and that reasonable precautions be taken to prevent further damage to the injured areas. He testified at the trial that the possibility of placing Mrs. Adams in a closed ward following the incident was discussed, but it was felt that, to prevent any indication to Mrs. Adams of "regression," she would be left on the open ward. However, he further testified that her privilege of leaving the ward and going out onto the grounds was withdrawn for a time.

Mrs. Adams was given the sedation ordered and was kept under close supervision by the morning shift. She did not

attempt to leave the ward before the shift change at 3 p.m.

However, no special precautions were taken by the afternoon shift concerning Mrs. Adams, and, sometime after the change of personnel shifts at 3 p.m. on February 18, she left the ward by the only outside exit door, one which was located only a few feet from, and clearly visible through, the glass window of the ward office. Normally someone is assigned to the desk in the office, and one of the duties of that person is to see that those whose ground privileges have been removed do not go out that door.

At about 4:10 p.m., Mrs. Adams was seen walking along Steilacoom Boulevard about a quarter of a mile north of the hospital main gate. As the automobile driven by Air Force Staff Sergeant James Stagdon neared her, she suddenly jumped in front of it. The automobile struck her, and she was taken to Lakewood General Hospital for treatment of the resulting injuries. Mr. Adams was notified by Lakewood Hospital of the accident.

Appellant assigns as error the trial court's denial of its motions for directed verdict, judgment notwithstanding the verdict, and for a new trial. It is also urged by appellant that the evidence is insufficient to sustain the jury verdict.

■ Appellant contends that, for the state to be held liable in this case, it must be shown by a preponderance of the evidence that its action or failure to perform a specific act was negligent (citing *Cochran v. Harrison Memorial Hosp.*, 42 Wn.2d 264, 254 P.2d 752 (1953)); that such negligence was the proximate cause of the injury to Mrs. Adams (citing *Roth v. Havens, Inc.*, 56 Wn.2d 393, 353 P.2d 159 (1960)); and that the resulting injury was a reasonably foreseeable consequence of appellant's negligent conduct (citing, among others, *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 407 P.2d 440 (1965)). We agree with the principles announced in those cases. However, we disagree with appellant's application of those principles to the facts of the case at bar.

Respondents' contentions consist essentially of this: There was a recognition on the part of the doctors and the

morning staff that there was a substantial danger that Mrs. Adams might inflict self-injury if she were not sedated and kept under close observation, and an even greater danger if she were permitted to leave the building. Proper orders were issued by Dr. Pettera to protect Mrs. Adams against that danger. Those orders were not followed by the afternoon shift, nor was the afternoon shift informed of the events which had culminated in those orders, with the result that, in violation of those orders, Mrs. Adams was not prevented from leaving the ward, and, as a proximate result, sustained the injuries for which recovery is sought in this action.

If these assertions are supported by substantial evidence, a sufficient case was made to go to the jury, and the trial court's denial of appellant's motions was proper.

That Dr. Toyama, the physician who treated Mrs. Adams' wounds following the window-breaking incident on the morning of February 18th, recognized the danger of self-injury is apparent from his recommendation on the consultation report quoted above.

While Dr. Pettera disagreed with Dr. Toyama's interpretation of Mrs. Adams' actions, in that he felt they were an expression of hostility rather than deliberate attempts at self-injury, he was clearly concerned about the possibility of self-injury, whether intentional or not. He had ordered that Mrs. Adams' ground privileges be withheld. On cross-examination, he testified:

Q. . . . wouldn't it be true, Doctor, that one of the reasons for your not wanting her to leave the floor was because she had exhibited some tendency toward self-injury that day? A. Yes. Q. There wouldn't be any other reason for your not wanting her to leave the floor particularly, would there, Doctor? A. Yes. Q. As a matter of fact, out on the grounds, if she wanted to injure herself, outside there was a lot more chance of injuring herself than on the closed ward where you try to keep means of self-injury pretty well away from the patient; isn't that right, sir? A. Yes.

Virginia Dryer, Mrs. Adams' trainee group leader and attendant on the morning shift, stated in her deposition that

she understood that the reason Mrs. Adams was to be watched was because she was so depressed that she might be dangerous to herself.

That proper orders were issued is evidenced by the testimony of Dr. Pettera. On direct examination, he testified that:

> A. I ordered that she be sedated, that she be kept under observation. Q. And what sedation did you order for her? A. I ordered Nembutal again, grains 3 this time. Q. And what observation did you order for her? A. I ordered that she be kept on the ward and that she be kept under observation so that she could not leave the ward, and that reasonable precautions would be taken that she could not further damage the injured area, and to take reasonable precautions that she would not further do anything, to break any more windows.

A great deal of weight is given by appellant to Dr. Pettera's testimony that the close observation ordered was to continue only until Mrs. Adams was sedated and sleeping, *i.e.* not necessarily into the night or even throughout the daylight hours.

However, the close observation of Mrs. Adams while in the ward is something quite different from the revocation of grounds privileges, also ordered by Dr. Pettera. Regarding the latter, Dr. Pettera testified, on cross-examination:

> Q. . . . And, Doctor, did you intend that she have privileges to go out on the grounds that day? A. No. Q. As a matter of fact, it was your understanding that she had been kept from privileges of going out on the grounds that day as soon as this incident [window breaking on February 18] happened; isn't that correct? A. Yes. Q. And you intended that that continue all day; isn't that correct, sir? A. Yes. Q. And continue probably until at least the next morning; isn't that correct sir? A. Yes.

Clearly, it was the failure of the afternoon shift to follow the doctor's orders in this latter respect, not in the former, that we are concerned with in this case.

There was substantial evidence from which the jury could find that neither the orders from Dr. Pettera nor the events of the morning involving Mrs. Adams were commu-

nicated to the afternoon shift by anyone. Although hospital regulations require that a shift report at change-over be held, it is undisputed that this regulation was not complied with on February 18.

Appellant argues that the incident resulting in Mrs. Adams' injuries was not foreseeable, and hence there should be no liability on the part of the hospital or of the state. This argument is based, essentially, on the fact that Mrs. Adams had never before, while in Western State Hospital, attempted to "escape," nor were her acts earlier that morning of such a nature as to indicate a present suicidal intent which would require the sacrifice of the rehabilitative benefits from the milieu therapy treatment.

■ We feel the argument is unsound under the circumstances of this case. It overlooks the evidence tending to show that the danger of self-injury was clearly foreseen by each of the two doctors, and that orders were issued by Dr. Pettera that Mrs. Adams be kept on the ward for the very purpose of preventing such self-injury. Clearly, where such orders, given for that purpose, were not followed (and there was substantial evidence that they were not in this case), it can hardly be argued that the resulting self-injury was not foreseeable.

Appellant contends, however, that it was the risk of self-injury only that was realized, and not the risk of *suicide*, or attempted suicide. Indeed, the testimony of both Dr. Pettera and Dr. Toyama indicates that they did not view Mrs. Adams as a *suicide* risk.

■ But under the facts presented, we decline to draw such a distinction legally, however valid the medical or psychiatric distinction might be. We perceive little difference from the standpoint of the requirements of legal liability, whether the actions of the patient causing her injury were motivated by a desire for self-destruction, self-injury, or defiance of authority. The risk of injury was foreseen, orders were given to prevent such injury, and had those orders been followed, the injury would not have occurred. It is well established that, on the question of foreseeability, the pertinent inquiry is not whether the actual harm sus-

tained by Mrs. Adams was of a particular kind which was expectable, but whether the actual harm fell within a general field of danger which should have been anticipated. *Fleming v. Seattle*, 45 Wn.2d 477, 275 P.2d 904 (1954); *McLeod v. Grant Cy. School Dist.*, 42 Wn.2d 316, 255 P.2d 360 (1953); *Berglund v. Spokane Cy.*, 4 Wn.2d 309, 103 P.2d 355 (1940).

In the present case, it was foreseen by Dr. Pettera that Mrs. Adams might commit an act which would result in injury to herself, and that, if she were permitted to leave the ward, the chances of sustaining injury were greatly enhanced. Appellant's argument on the question of foreseeability is without merit.

■ Appellant argues that a holding of liability in this case would require the hospital to put a patient like Mrs. Adams in isolation. Our decision on this issue does not rest upon the choice of treatment for Mrs. Adams. Whether a patient is placed in an open ward and given milieu therapy (which is felt by the medical profession at large to be a significant step forward in the treatment of mental disorders) or put under physical restraint is a matter of medical judgment, with which this court should not interfere.

What is involved in the case at bar is the failure of those on the hospital staff to follow the orders of a patient's attending physician. As pointed out in *Baker v. United States*, 226 F. Supp. 129, 131 (1964), cited by appellant:

> In considering the various allegations of negligence it should first be observed that there is no evidence indicating that hospital employees failed to carry out the orders of Dr. Kennedy or any other physicians in the care of the patient. *Failure on the part of hospital employees to carry out the instructions of a patient's physician may constitute a violation of the standard of care required of hospitals. Shover v. Iowa Lutheran Hospital*, 252 Iowa 706, 107 N.W.2d 85 (1961). (Italics ours.)

Equally obvious is the fact that liability here does not rest on any asserted misjudgment on the part of Mrs. Adams' attending physician. He exercised proper judgment in ordering that Mrs. Adams' privilege to go out on the hos-

pital grounds be suspended for a time. Because of the failure of the morning shift to communicate those orders to the afternoon shift, or the failure of the afternoon shift to carry out those orders, the risk of injury *actually foreseen* by the attending doctor became a reality. At the risk of being redundant, we again emphasize that the failure to follow the physician's orders is the basis of liability in this case. Many of the cases cited by appellant in support of his arguments are, therefore, distinguishable, *e.g. Evangelical United Brethren Church of Adna v. State, supra; Emery v. Littlejohn*, 83 Wash. 334, 145 Pac. 423 (1915); *Cochran v. Harrison Memorial Hosp.*, 42 Wn.2d 264, 254 P.2d 752 (1953); *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963); *White v. United States*, 244 F. Supp. 127 (1965).

In summary, respondents introduced substantial evidence to support the allegation that the hospital was negligent in the manner described above, and that such negligence was the proximate cause of the injuries suffered by Mrs. Adams. That evidence supports the verdict on the issue of liability, and, if submitted to the jury under proper instructions, will not be disturbed on appeal by this court. *Reuter v. Rhodes Inv. Co., ante* p. 31, 425 P.2d 929 (1967).

We now turn to a consideration of appellant's assignments of error relating to the instructions given and the proposed instructions refused by the trial court.

Appellant first contends that the trial court erred in giving instruction No. 8, which stated that:

> You are instructed that when a hospital accepts a patient and knows of, or is warned of, the patient's tendencies toward self-injury or suicide, the hospital is required not only to use reasonable care in treating the patient for his or her illness, but also reasonable care in safeguarding him or her from self-inflicted injuries or death. This duty is proportionate to the patient's needs; that is, such reasonable care and attention as the patient's known mental condition requires.

We find that appellant's first ground for objection to this instruction is without merit. Its contention is that, by this instruction, the trial court erroneously informed the jury

that the phrases "self-injury" and "suicide" were synonymous. The instruction is not reasonably susceptible to that construction.

Appellant next assigns as error the trial court's refusal to give its proposed instructions Nos. 6 and 7, and contends that the effect of giving instruction No. 8 without instructions Nos. 6 and 7, as proposed, defining the standard of care required of the hospital's physicians and of the hospital personnel, effectively informed the jury that there were no standards in law by which they could judge the propriety of the actions of Mrs. Adams' treating physician or of the hospital personnel in this case.

Appellant's instruction No. 6 would have informed the jury that:

In the care and treatment of mentally ill persons a hospital is not required to closely supervise and restrain or isolate persons under its care solely by reason of the fact that such persons have in the past, but not within the hospital's care, attempted suicide.

The Defendant, in the operation of Western State Hospital, owes to its patients such ordinary care and attention as the mental and physical condition of such patients requires. The law demands reasonable care, such care as a reasonable man in a like or similar position would take under the circumstances existing. But Western State Hospital is not required to take measures against a danger which the circumstances as known to its employees do not suggest is likely to happen.

Therefore if you find that the plaintiff wife's mental and physical condition and the circumstances surrounding her care and treatment, as known to defendant's employees on February 18, 1964, did not suggest the danger that she would escape or elope from the hospital care and become injured or that unknown to defendant's employees she harbored a suicidal intent on that day, then you must find for the defendant.

Appellant's proposed instruction No. 7 would have further told the jury that:

It is the law that a mental hospital cannot guarantee the safety of its patients.

A mental hospital owes a duty to its patients, including patients who have attempted suicide in the past, to provide treatment for their particular illness. If a staff physician exercised reasonable care and diligence in making his medical judgment to enter upon a particular type of treatment and care, then the physician and the hospital are not liable if his medical judgment is found to be erroneous.

Therefore, if you find that the medical judgment of the staff physician in prescribing a method of treatment for plaintiff wife was an exercise of reasonable care and diligence, and that hospital personnel exercised reasonable care and diligence in carrying out the instructions of the staff physician, then you must find for the defendant and against the plaintiffs even if you find that the medical judgment was erroneous.

■ Proposed instruction No. 6 concerns itself with the question of foreseeability. (See discussion *supra*, p. 412). It erroneously requires the jury to find for the defendant unless the patient's mental condition and the surrounding circumstances suggest the danger of escape or that Mrs. Adams secretly harbored a suicidal intent, even though her attending physician had given orders that she be kept from leaving the ward for the purpose of protecting her against the *foreseen* danger of self-injury, and those orders were not followed. This is not the law. The trial court is not required to give an instruction which is erroneous in any respect. *Vogel v. Alaska S.S. Co.*, 69 Wn.2d 497, 419 P.2d 141 (1966); *Bloomquist v. Buffelen Mfg. Co.*, 47 Wn.2d 828, 289 P.2d 1041 (1955).

Although proposed instruction No. 7 correctly states the law, no evidence was presented by respondents tending to show negligence on the part of Mrs. Adams' attending physician.[1]

---

[1] Appellant recognizes, in its brief, that "respondents on several occasions during the trial stated that this was not a medical malpractice action or an action challenging the facilities or qualification of personnel," but contends that "nevertheless respondents resisted appellant's motion to strike those issues from the pleadings and from consideration of the jury, and resisted appellant's motion for directed verdict on those issues at the close of the evidence."

■ It is error to submit an issue to the jury when it is not supported by substantial evidence. See *Izett v. Walker*, 67 Wn.2d 903, 410 P.2d 802 (1966); *Thompson v. Groves*, 68 Wn.2d 790, 415 P.2d 648 (1966).

In summary, the jury was instructed by the court in instruction No. 8 that appellant owed Mrs. Adams the duty of reasonable care for her protection, "such reasonable care and attention as the patient's known mental condition requires." That instruction was sufficient under the evidence before the jury, and, for the reasons stated above, appellant's three assignments of error in relation thereto are without merit.

We conclude that the verdict and judgment on the issue of liability must be sustained.

We turn now to the question of damages. Respondents, in their amended complaint, sought damages in the sum of $350,000. The jury returned a verdict in the sum of $275,000. We are asked to hold that the amount of the verdict was excessive and reflects passion and prejudice on the part of the jury.

In instruction No. 12, the trial court instructed the jury that:

If you decide for the plaintiffs on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the plaintiffs for any of the following elements of damages arising out of the injuries to the plaintiff wife, proved by a preponderance

Appellant's motion for directed verdict at the close of the evidence was directed to "the question of liability." It was not limited to the issues of malpractice or qualifications of personnel. Respondents properly and necessarily resisted that motion.

The earlier motion referred to by appellant did seek to have removed from the complaint the allegation that appellant had failed to "Provide adequate facilities for her treatment and protection, provide adequate treatment and provide adequate and qualified personnel." The motion was resisted by respondents because, even though the action was not founded on malpractice, the claim was still that there was not proper supervision, treatment, protection, or care as far as she (Mrs. Adams) was concerned. We do not feel that the resistance to the motion made was prejudicial to appellant, in view of the evidence in fact presented. The evidence supports only the issue discussed in this opinion.

of the evidence to have resulted from the negligence of the defendant's hospital:

The nature, extent, and duration of the injuries sustained by the plaintiff wife;

The disability and disfigurement of the plaintiff wife resulting from the injuries;

The pain and suffering experienced and reasonably certain to be experienced in the future as a result of the plaintiff wife's injuries;

The reasonable expenses of necessary medical care, treatment, and services received by the plaintiff wife; and the present cash value of any necessary medical care, treatment and services which with reasonable certainty plaintiff wife will require in the future;

The reasonable value of the services of the plaintiff wife which have been deprived of the plaintiff husband, and the present cash value of her services of which, with reasonable certainty, he will be deprived in the future;

The reasonable value of the society, companionship, and conjugal relation between the plaintiff husband and the plaintiff wife, of which the plaintiff husband has been deprived; and the present cash value of the society, companionship, and conjugal relation between them of which, with reasonable certainty, the plaintiff husband will be deprived in the future, and her parental care, guidance, training, education, and comfort to their children.

By instruction No. 14, the jury was told by the court that:

In assessing the damages in this case should your verdict be for the plaintiff, you are instructed that if you should find from a preponderance of the evidence that Maude Adams will need care and/or supervision for the rest of her life, or a portion thereof, that your verdict should include an amount to provide the reasonably necessary cost of such care and/or supervision for such period in addition to the other items of damage you may find justified by these instructions.

Instruction No. 15 further told the jury that:

If you find from the evidence that before this accident the plaintiff, Maude Adams, had a chronic mental condition, and further find that such condition was aggravated

because of the accident, so as to cause further suffering and disability, then plaintiff is only entitled to recover disability or pain proximately due to such aggravation, but is not entitled to recover for any physical ailment or disability which may have existed prior to the accident or for any from which plaintiff may now be suffering which were not caused or contributed to by reason of the accident.

The evidence is undisputed that Mrs. Adams was in good physical health prior to the accident. Following her injury, Mrs. Adams' physical injuries included the following: Multiple fractures of the skull—fracture of the right frontal bone, fracture of the right side of the skull in the lower frontal parietal region, fracture lines crossing the meningeal grooves, basal skull fracture; possible cranial cerebral trauma with contusion and laceration; fractured jaw resulting in maloclusion of the teeth; fractured left forearm; several pelvic fractures; fracture of the right elbow which is ankylosed (fused) at a right angle with no motion; fracture of the fourth rib on the left and the tenth rib on the right; a 5-inch stellate laceration of the forehead; and an injury to the spleen which required its surgical removal. Mrs. Adams remained in a coma for several weeks following her injury.

As a proximate result of the accident, Mrs. Adams' hospital expenses at Lakewood General Hospital were $1,631.65. The doctor's bill for removal of her spleen was $600. Another doctor's bill totaled $45. The charges for her hospitalization at Western State Hospital to the date of the trial totaled $3,434.80. There was no dispute as to these items.

Several witnesses who were acquainted with Mrs. Adams prior to her hospitalization, testified that, prior to her injury, she was an intelligent woman, fond of reading and music, and was a good wife and mother. Dr. Austin, the psychiatrist from Longview who had treated Mrs. Adams prior to her admission to Western State Hospital, testified that, in his opinion (based on the textbooks), she had about an 80-per cent chance of recovery at that time. Although this estimate is challenged by appellant, no contrary evi-

dence was presented by the state on this issue, and the weight to be given this testimony was a question for the jury.

Since her injury, Mrs. Adams suffers from dysphasia (inability to articulate adequately) and a bulbar-type speech (guttural, mushy speech in a very low, unexpressive voice); a severe memory impairment (unaware of the name of the president, governor, the hospital she is in, or even the day of the month); and visual agnosia (what she sees is misinterpreted by the brain). She walks in a shuffling manner such as that seen in advanced Parkinson's disease; can read the very large print on a page, but cries in frustration at trying to read the content of an article. She can no longer properly control her facial movements; and suffers from serious personality defect with a lack of orientation, judgment, and intellect. There is a 20-30 percent chance that she will be subject to epileptic seizures. There is apparently some awareness on her part of her condition as evidenced by her frustration and crying at being unable to read or converse. These difficulties are the result of organic brain damage.

Dr. Klemperer, a neurosurgeon who examined Mrs. Adams at the request of respondents, testified that:

> Her total damage at this time is such that in my opinion she will need institutionalization and constant nursing supervision for the rest of her life; that she is incapable of self-care and improvement, and that there is little likelihood of change foreseeable; that her present status is fixed.

At the time of trial, Mrs. Adams had a life expectancy of 34.88 years. The present charges at Western State Hospital for her care are $188 per month. If it were to become necessary for Mrs. Adams to be transferred to a nursing home, the charges would presently be in excess of $300 per month, plus the cost of doctors and medicines.

Mrs. Adams' children, at the time of trial, ranged in age from approximately 2 years to 8 years. Mr. Adams has been required to employ a housekeeper for the children at a cost of $20 per week plus room and board.

The trial court, in its oral opinion on denying appellant's motion for judgment n.o.v. or alternatively for a new trial, stated:

Now getting to the amount of the judgment, this causes me considerable trouble. I think it's excessive, but let's just take a look at how this came about.

The Plaintiff through Mr. Horswill sought judgment for $350,000. Mr. Horswill on the board projected the items of damages, and as I remember they totaled $355,000, but he was only of course asking for $350,000. Now this bothered me to the extent that I myself had a transcript made of the closing arguments of defense, and I would like to read them into the record. Right at the beginning, counsel for the State said: "Now the State in this action is not contending that Maude Adams has not been damaged. This would be futile. We, our own doctors have testified that she has suffered serious brain injury. I certainly feel as bad about that as I am sure you do. This woman is in a terrible state, but that question is not for you to decide until you decide that the State was liable. This we do not contest. We don't say that she is not in poor condition, but we do say we are not responsible or that the State is not responsible."

Then counsel goes on with their argument about the liability question, but then at the end of that says, "As I have said, the figures up there, I don't know if I were in her shoes I don't think you could give me enough, or in her husband's shoes, you couldn't give me enough, but you can't compensate people for losses of arms or losses of parts of their brain, but before you decide to give the compensation, please consider this liability problem. I don't believe that the State is responsible for the present condition. I have every confidence in you that you will arrive at a fair and just verdict as counsel has indicated. You have all indicated previously that you could and I have every confidence that you will. Thank you very much."

Now what was the jury to think? There were no guidelines presented to the jury by which they could justify or determine what would be a proper amount of damages to be awarded. They did on their own reduce the demand from $350,000 down to $275,000. And yet it would appear to me that the State virtually conceded that the asking price of $350,000 was not an excessive

amount. And while, as I have indicated, *I feel that this verdict is excessive, I do not feel under these circumstances that it is up to me to reduce this verdict.* Furthermore, I don't think it is up to me to reduce the verdict where it might have the effect of putting the Plaintiff in the position of having to appeal, but if there is going to be an appeal, and I think there should be, then let it come from the State, and if the Supreme Court then says that they agree with me that the liability question was properly submitted to the jury, then let the Supreme Court say whether or not this verdict should be reduced. (Italics ours.)

■ Appellant argues that once the trial court has found the verdict to be excessive, it has a *duty* to reduce the amount of the verdict or to grant a new trial. This is not the law where, as here, the verdict was not found to be so excessive as to unmistakably indicate passion and prejudice. See *Anderson v. Dalton*, 40 Wn.2d 894, 246 P.2d 853, 35 A.L.R.2d 302 (1952).

■ This court set forth the test to be applied to this issue on appeal in *Kramer v. Portland-Seattle Auto Freight*, 43 Wn.2d 386, 395, 261 P.2d 692 (1953), wherein it was said that:

On the one hand, the following must be considered: Each cause depends, to a large extent, upon its own facts and circumstances. The verdict must be compensatory of a pecuniary loss. *Walters v. Spokane International R. Co.*, 58 Wash. 293, 108 Pac. 593 (1910). It can be substantial [citing authorities] but not out of proportion to actual damages. *Halverson v. Seattle Electric Co.*, 35 Wash. 600, 77 Pac. 1058 (1904). The amount of the damage is within the discretion of the jury, under proper instructions. The jury is given considerable latitude in making such determination as to it seems just. *Aronson v. Everett*, 136 Wash. 312, 239 Pac. 1011 (1925); *Ticknor v. Seattle-Renton Stage Line*, 139 Wash 354, 247 Pac. 1 (1926). The subject matter being difficult of proof, it cannot be fixed with mathematical certainty by the proof. Once the determination is made, an appellate court will give great weight to, and is reluctant to interfere with, the jury's verdict. *Kellerher v. Porter*, 29 Wn.2d 650, 189 P.2d 223 (1948).

On the other hand, the balancing factor is the conscience of the appellate court, when there is an affirmative showing that passion and prejudice played no part in the jury's determination. Is the amount flagrantly outrageous and extravagant? Is it unjustified in the light of the evidence? Does it disclose circumstances foreign to proper jury deliberations? If it is and does, then it can be said to shock the sense of justice and sound judgment, and the verdict of the jury is excessive.

This court has subsequently consistently applied this test in considering the problem involved in the present case. See *Gustin v. Susnar*, 68 Wn.2d 504, 413 P.2d 822 (1966); *Fosbre v. State*, 70 Wn.2d 578, 424 P.2d 901 (1967). See, also, *Workman v. Marshall*, 68 Wn.2d 578, 414 P.2d 625 (1966).

We have carefully considered the record relating to the damages suffered by Mrs. Adams and her family, and feel convinced that, in light of all the circumstances, the amount of the verdict does not exceed a realistic appraisal of those damages.[2] It does not shock our sense of justice and sound judgment. Nor is it of such size that it clearly indicates improper consideration of certain allegedly inflammatory matters alluded to by appellant.

---

[2]Some discussion was had between the court and counsel concerning the possibility of a stipulation or judgment by the court in the event of a finding of liability on the part of appellant, whereby the state would provide Mrs. Adams' care for as long as she needed it in lieu of money damages. Counsel for appellant, told the court, however: ". . . I was unable to coordinate the different departments of the state government that would be required to participate and because there is, although it's a very slight possibility, there is a possibility that she would not qualify for care in Western State Hospital if her present mental condition reduced itself or cured, so we are therefore not able to either enter the stipulation or judgment."

However, Mr. Adams testified that he had, on the advice of counsel, filed a petition for the appointment of a general guardian for Mrs. Adams in the Pierce County Superior Court, and that in the event of a favorable verdict, he was willing to abide by whatever apportionment the court might decide was proper, and see to it that any amounts allocated to Mrs. Adams go into the guardianship account to be administered under court order by anyone whom the court appoints as a guardian. He further testified that he would be willing to do the same with regard to any funds allocated for the care of the children.

434

The verdict and judgment thereon are, therefore, affirmed.

FINLEY, C. J., HILL, WEAVER, HUNTER, HAMILTON, and HALE, JJ., and STAFFORD, J. Pro Tem., concur.