George R. **PESSAGNO** and Jewell E. Reynolds, Administrators of the Estate of James R. Pessagno, Deceased, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 88–1404–F.

United States District Court,
S.D. Iowa, C.D.

Sept. 6, 1990.

Robert Downer and Thomas Hobart, for plaintiffs.

Christopher D. Hagen, Asst. U.S. Atty., for U.S.

Nancy Moody, for Dept. of Veterans' Affairs.

## MEMORANDA OPINION AND ORDER

CELESTE F. BREMER, United States Magistrate.

This is an action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, arising from the death of plaintiffs' son, James R. Pessagno. Plaintiffs instituted the present lawsuit on August 12, 1988, against defendant, the United States of America. Jurisdiction exists under 28 U.S.C. section 1346(b). The parties filed a consent to proceed before a United States Magistrate pursuant to 28 U.S.C. section 636(c) on May 1, 1990, and the case was referred on May 4, 1990.

This case was tried to the court in Des Moines, Iowa on August 21–24, 1990. Plaintiffs were represented by Robert Downer and Thomas Hobart and defendant was represented by Christopher D. Hagen, Assistant U.S. Attorney, and Nancy Moody, counsel for the Department of Veterans' Affairs.

## FINDINGS OF FACT

In January of 1981, James Pessagno, born December 16, 1962, enlisted in the United States Marine Corps. He continued on active duty until his discharge in May, 1984. He was judged to have a 100% service-connected mental disability and received benefits from the Veterans' Administration. From the date of his discharge, James returned home to live with his parents, the plaintiffs in this action, and continued to have problems coping with daily life. James was depressed, apathetic and unable to find employment.

Shortly after his discharge, James was treated for a mental disorder at the University of Iowa Hospital and was hospitalized from October, 1984 until January, 1985, when he was discharged and returned to his parents' home. He was diagnosed as having a bipolar disorder and treated with medications including Lithium and Navane. After his release, he resided with his parents and received outpatient care and medication. After threatening to commit suicide in October, 1985, he was involuntarily committed to the V.A. Hospital in Iowa City where he remained until January, 1986. While in the V.A. hospital, he received various medications to control his behavior. Before his discharge, all medications were stopped in order to determine a "baseline" for his behavior without medication.

In early February, 1986, James was again involuntarily committed to a closed ward in the V.A. Hospital in Iowa City. A closed ward is one where the staff controls all entrances and exits. In March, 1986 he was transferred to V.A. Hospital in Knoxville, Iowa, for long term psychiatric care.

While in Knoxville, James was confined to 85–DC, a closed ward for patients with acute mental disorders, where he was supervised by the hospital staff. Upon admittance, he was diagnosed as having a schizo-affective disorder and was given Thorazine, an antipsychotic drug used to control these types of symptoms. Because of adverse side effects, Navane, another antipsychotic, was prescribed. By the end of April, 1986, the dosage of Navane had increased to 60 mg. per day. As a result of taking Navane, James experienced certain side effects. Among them was acathesia, a feeling of restlessness which appeared to manifest itself in James by causing him to pace nearly continuously. However, the pacing had been a consistent behavior with James since the onset of his mental illness, and it was not clear to what degree it was attributable to the medication or merely to habit.

While on 85–DC, James' progress had advanced to the point where he had obtained ward "privileges" which allowed him

to go to the cafeteria and canteen and move about the hospital grounds unescorted for up to one hour at a time. James' parents visited him frequently while he was on 85–DC and eventually they were allowed to escort James on short trips to town. This was part of the overall mental health treatment program offered by the V.A., which attempts to use the least restrictive means to control patients while they are readied for transfer to communal living outside the V.A. hospital.

On April 15, 1986, James assaulted a nurse's aid on 85–DC. As a result, he was placed in four-point restraints so as not to harm himself or others. His medication was increased. Another incident occurred on May 5, 1986, when he became disruptive in the cafeteria. He was again placed in four-point restraints. After this incident, James' dosage of Navane was increased to 80 mg. per day with the nurses on staff authorized to administer up to an additional 40 mg. per day as needed. He was also prescribed Lithium Citrate to control his agitation and impulsive behavior and Cogentin to control his acathesia. Thereafter, James' condition stabilized and he had no other violent outbursts.

On May 29, 1986, Dr. Samopalli, James' treating psychiatrist on 85–DC, transferred him to the Transitional Care Unit (TCU), an open ward with a sixty-day program designed to provide patients with assistance in making the transition from the hospital setting to communal group home or other non-hospital living. Samopalli's decision was based upon the improvements seen in James' behavior after he began taking Lithium. His parents continued to visit him regularly while he was on this ward. The transfer to the TCU and visitation were consistent with the overall treatment plan of the institution which was developed for James when he was received as a patient. If a patient was not ready to be released from the TCU at the end of sixty days, it was permissible for him to stay until he was ready to live outside the hospital.

James continued to pace constantly while committed to the TCU, although he slept regularly. In an effort to reduce the pacing, the dosage of Navane was decreased and behavior therapy was offered. Some reduction in the pacing was noted; however, on June 10, James and the staff decided that he should not attend a ward picnic because he was still unable to sit still for the one hour bus ride to the park. Additionally, an overnight stay at an Iowa City group home was postponed because the staff felt James was not ready to make the trip.

The prognosis for James' long-term serious mental illness was that there was little or no chance of his ever living independently outside of a group home, family, or other custodial setting. Due to the nature of his disorder, his symptoms would wax and wane, alternating depression with manic or "up" phases. The V.A. Hospital tried to level these cycles with medication, but success was limited.

On the morning of June 13, 1986, James learned that the TCU staff had granted him a five hour town pass for the next day. This was based on the improvement in his behavior over the past thirty days. Shortly thereafter at approximately 9:00 a.m., James left the TCU and the V.A. Hospital grounds. Witnesses testified that at 9:30 a.m., James appeared to deliberately jump in front of a semi-trailer truck. He was struck and died from related injuries four days later.

## CONCLUSIONS OF LAW

The issue before the court is whether the defendant exercised due care in treating James Pessagno while he was at the Knoxville V.A. hospital. All events giving rise to this litigation occurred in Iowa, therefore Iowa tort and negligence law is controlling. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Generally, negligence is defined as conduct that falls below the standard established by law for the protection of others against unreasonable risk of harm. *Seeman v. Liberty Mutual Insurance Co.*, 322 N.W.2d 35 (Iowa 1982). In order for plaintiffs to recover, they must prove both the negligence of the defendant and that the negligence was the proximate

**152**

cause of the injury. *Blackhawk Building Systems Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg*, 428 N.W.2d 288, 291 (Iowa 1988).

"Hospitals should be held to the standard of care which obtains in hospitals generally under similar circumstances." *Clites v. State*, 322 N.W.2d 917, 919 (Iowa Ct.App. 1982), citing *Dickinson v. Mailliard*, 175 N.W.2d 588, 596 (Iowa 1970). "The duty of a hospital and its staff to exercise reasonable care to protect suicide patients against foreseeable harm to themselves is well-established." *Abille v. United States*, 482 F.Supp. 703, 705 (N.D.Cal.1980), citing *Stuppy v. United States*, 560 F.2d 373, 375 (8th Cir.1977). Although there are no Iowa cases directly addressing the standard of care required for mental patients, this court has held that "the care required of a hospital includes giving such care to a patient as the hospital knew or in the exercise of reasonable care should have known was required." *Baker v. United States*, 226 F.Supp. 129, 132 (S.D.Iowa 1964).

█ Plaintiffs assert several issues to be decided in determining whether defendant is liable for the death of their son: (1) whether James R. Pessagno was a proper candidate for transfer to the V.A. Knoxville TCU at the end of May, 1986; (2) whether he was properly treated and medicated after his transfer to the TCU; (3) whether he was properly supervised after his transfer to the TCU; (4) whether he should have been transferred back to the closed psychiatric ward from the TCU; (5) whether defendant took proper steps on June 13, 1986, to attempt to prevent the injury and ultimate death of James R. Pessagno; and, if liability is established, what damages did James R. Pessagno's Estate suffer as the result of his death.

James Pessagno was a patient at the Knoxville V.A. hospital from March 7, 1986, until June 13, 1986. From his admittance until May 29th, he was assigned to the closed ward for treatment and evaluation. During this time, two incidents occurred which required that he be placed in restraints. This was not such an unusual occurrence as to necessitate keeping him

confined to the closed ward longer than was warranted by his behavior. In fact, he was transferred to the open ward three weeks after his last disruptive incident. During his confinement at the V.A. hospital, James never expressed any suicidal ideations which would put the staff on notice that this was his plan. James' condition improved to a point where he was fairly stable and was a proper candidate for transfer to the open ward at the end of May, 1986.

While on the TCU, James never expressed any suicidal ideations. He continued to receive counseling and medication. His condition appeared to be improving. He attended training modules which were designed to help him adjust to life outside the hospital setting. The method of treating patients such as James in this V.A. Hospital, or similar hospitals treating the mentally ill, was to allow them to progress from a restrictive environment to the least restrictive living arrangement possible. From the outset, the V.A. staff tried to prepare him for group home living. James was allowed to go from the closed ward to the cafeteria and the canteen. He was allowed off V.A. grounds escorted by his parents and had been approved for a pass which would allow him to go into town unescorted. While on the TCU, James continued to receive Navane and Lithium which stabilized his condition. This form of treatment was wholly consistent with the methods employed by other similarly situated mental hospitals. James was properly treated and medicated while on the TCU. When addressing the issue of the proper standard of care required in the treatment of mental patients, this court has held:

"Calculated risks of necessity must be taken if the modern and enlightened treatment of the mentally ill is to be pursued intelligently and rationally. Neither the hospital nor the doctor are insurers of the patient's health and safety. They can only be required to use that degree of knowledge, skill, care and attention exercised by others in like circumstances."

*Baker v. United States*, 226 F.Supp. at 134–35.

James had been in the Iowa City and Knoxville V.A. hospitals' closed wards for almost four months before his condition progressed enough to allow him to transfer to the open ward. While on the open ward, the staff felt it best to cancel two trips tentatively planned for James; the overnight stay at the group home in Iowa City and the ward picnic. This did not mean that James should have been transferred back to the closed ward, or that the hospital was negligent in allowing him to remain in the TCU. Up until the date of his suicide, James was never allowed to venture off V.A. grounds unescorted nor did he make any attempt to do so. James' supervision while at the Knoxville V.A. was wholly consistent with the overall treatment of a patient in his condition, and was reasonable in light of his patterns of behavior.

On June 13, 1986, James was informed that his pass to leave the V.A. grounds unescorted had been approved. He then left the V.A. grounds unnoticed by the TCU staff. The staff determined that James was unaccounted for only after the police notified the V.A. hospital that someone whom they thought was a patient had been involved in an accident. The time that elapsed between James' leaving the V.A. hospital grounds and the time of his suicide could not have been more than thirty minutes. The court finds, given the method of treatment, that the defendant was not negligent in leaving James unsupervised for this brief period.

The plaintiffs have not sustained their burden of proof in their allegation that the defendant failed to take proper steps to prevent the injury that eventually lead to James' death. The ability of James to walk away from his ward and off the hospital grounds was not a proximate cause of his death. The defendant did not breach the required standard of care. James' suicide was an act of impulse resulting from his mental illness and not the result of any act or omission on the part of defendant's employees. The suicide was not reasonably foreseeable by the hospital staff.

THEREFORE, based upon plaintiff's failure to establish liability by a preponderance of the evidence, judgment is entered in favor of the defendant, with costs assessed to the plaintiffs.

IT IS SO ORDERED.